No. 60,313

STATE OF KANSAS, *Appellee,* v. RAMON A. GARCIA, *Appellant.*

(763 P.2d 585)

Opinion filed October 28, 1988.

*Lucille Marino*, assistant appellate defender, argued the cause, and *Benjamin C. Wood*, chief appellate defender, was with her on the brief for appellant.

*Henry Otto III*, county attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: The defendant, Ramon Garcia, appeals his convictions by a jury of one count of aiding and abetting felony murder, K.S.A. 21-3401, and one count of aiding and abetting burglary, K.S.A. 21-3715. The defendant was sentenced to a controlling term of life imprisonment.

Cecil E. Bammes was found dead on his farm near Wamego, Kansas, on Sunday, May 18, 1986. A neighbor of Bammes' had heard four to five gunshots shortly after 5:45 p.m. on Friday, May 16, 1986. Bammes had been killed by two .22 caliber gunshot wounds to the head, and he was found lying face down in the yard near his pickup truck.

Both the truck and Bammes' body were within the yard of his house. The yard was fenced and enclosed and there was some evidence introduced at trial that the victim habitually kept the gate to the yard closed. A photograph taken by one of the investigating law enforcement officers who arrived on the scene on May 21, 1986, shows the driver's side door of the victim's pickup truck standing open. The officer testified that the pictures were an accurate representation of the existing scene when he first arrived. The officer also stated that he had found the yard gate open and the house door open which, he testified, was

unusual for the Bammes farm. Earl Bammes, the victim's brother, checked the victim's house after the homicide and found that a .22 caliber rifle and a radio were missing.

At the defendant's trial, Joe Cueva testified that, several weeks before Bammes' death, he had spoken with the defendant at a party in Topeka. Cueva testified that the defendant had told him he wanted to "rob" a place in Wamego because he believed there was a substantial amount of money there. Defendant told Cueva that the place he wished to "rob" belonged to an elderly person for whom defendant had worked in the past. Cueva, however, declined the defendant's invitation to join him.

On the morning of Friday, May 16, 1986, Ramon Garcia, Michael Rodriguez, Victor Martinez, and two other variously identified Mexican males stopped at the Topeka residence of Lyle Cobler. Testifying at the trial, Cobler identified the two Mexican males from an FBI circular as Jesus ("Chango") Hernandez and Chayo Gonzales Garcia. Cobler testified that defendant Garcia and the four others stayed for approximately 35 to 40 minutes. They then left in defendant's white 1972 or 1973 four-door Chevrolet Impala. Cobler then went to get some cigarettes, returning 45 minutes to an hour later to discover that his home had been broken into and his .22 caliber revolver had been stolen.

The defendant was first questioned by the police on Wednesday, May 21, 1986. Kirk Thompson, a special agent of the Kansas Bureau of Investigation, testified that he interrogated the defendant on Wednesday afternoon. Thompson testified that the defendant originally told him that he had not been in the Wamego area for about a month and a half. The defendant told Thompson that he had not left the Topeka area the previous weekend and did not know anything about the incident under investigation. However, after further questioning, the defendant later acknowledged that he went for a drive in the country on Friday, along with Rodriguez, Martinez, and two Mexican males from Kansas City.

Later in the interview, defendant told Thompson that he had stopped at the Bammes farm and parked his car near the driveway. Thompson testified that defendant told him that the two Mexican males and Victor Martinez had left the car for a short time and then returned; defendant then drove all of the men

back to Topeka. Defendant said that he had not heard any shots while he was at the Bammes farm. Finally, after additional questioning, defendant stated that he did hear one or two shots while parked at the Bammes farm. Defendant told Thompson that when the three men returned to the car, he saw a bulge, which he thought was a gun, in the pocket of one of the Mexican males.

Defendant was interrogated the following morning by Gerald Schmidt, an investigator for the Pottawatomie County Sheriff's Department. During the course of the interrogation, Schmidt told the defendant that he did not believe defendant's story about coincidentally stopping at the Bammes farm, and asked the defendant, "Did you go there with the intention of robbing [him], or did you go there with the intention of killing him?" Defendant replied that he did not go there to kill him but that he went there to "rob" the house.

Michael Rodriguez testified that he slept most of the time during the ride out to the Bammes farm on Friday, May 16. Rodriguez testified that the defendant told him during the trip out to the farm that they were going there to buy a goat. He testified that after they arrived at the farm, Martinez and the two Mexican males left the car. After a few minutes, Rodriguez heard one gunshot followed by two more gunshots one to two minutes later. Rodriguez asked the defendant, "Did you hear that shot?" Defendant told Rodriguez, "They probably shot that man." When the three men returned to the car, Rodriguez saw that one of the Mexican males was carrying a large, long object under a blanket.

Joe Cueva testified that he saw the defendant and the others in defendant's car at a Topeka club between 8:00 and 10:00 p.m. on the evening of May 16, 1986. Cueva approached the car and spoke for a brief time with the group. Cueva testified that, while he was talking to them, he noticed two rifles laying on the floor of the car. Cueva also saw that one of the Mexican males, whom he identified at trial from an FBI circular as Chayo Garcia, had a .22 caliber revolver tucked in his pants. Cueva testified that the revolver was the same one he had previously seen at Lyle Cobler's Topeka residence.

Alfonso Hluz testified that he saw the defendant on the afternoon of Saturday, May 17, 1986. Defendant asked Hluz if he

wanted to buy a rifle. When Hluz agreed, the defendant sold him a .22 caliber rifle for $15.00. The rifle was introduced into evidence as Exhibit 19.

The information as originally filed by the State on June 26, 1986, charged the defendant as a principal; however, on August 20, 1986, an amended information was filed, adding the aiding and abetting language to each count. The trial court granted the defendant's motion for acquittal as to the aggravated robbery count, and the jury found the defendant guilty of murder in the first degree and burglary, both as an aider and abettor. The defendant was sentenced to three to ten years for burglary and life imprisonment for the murder, the sentences to run concurrently.

Defendant first argues that Count 1 of the amended information does not charge the crime of felony murder because of the inclusion of the aiding and abetting language. He correctly notes that, under Kansas law, a person who counsels, aids, or abets in the commission of a crime may be charged and convicted as if he were a principal. *State v. Goering*, 225 Kan. 755, 758, 594 P.2d 194 (1979). However, while the aiding and abetting language was not required to charge the defendant with aiding and abetting the felony murder, it does not follow that the State is precluded from doing so, or that the inclusion of such language renders the information fatally defective. We are not aware of any Kansas appellate case, nor has one been cited by the defendant, that holds the inclusion of aiding and abetting language in the information renders it defective. In *People v. Smith*, 271 Mich. 553, 260 N.W. 911 (1935), the Michigan Supreme Court rejected such a conclusion and held that an information charging the defendant with aiding and abetting the commission of the offense of obtaining property by false pretenses was sufficient under the statute providing for prosecution of aiders and abettors as if he had directly committed the offense. The court reasoned:

"In the case at bar defendant was not injured by the particularity with which the offense was set forth in the amended information. It charged fully and particularly that one Guy Vanderwest had obtained money and property by false representations and pretenses, the manner in which he obtained them, and the means used; and it charged the defendant with aiding and abetting said Guy Vanderwest and, knowing the representations of said Guy Vanderwest to be false . . . . And in the charging part of the information, it charged the defendant with counseling, procuring, aiding, and abetting Guy Vanderwest in obtaining

goods and property from Howard M. Rouse and Mary Rouse by false represen-
tations and pretenses.

"We think the information was good under the statute, that defendant was not
injured by the particularity with which the offense was charged; but, on the other
hand, we commend the prosecution for setting forth the facts more clearly than is
made necessary by the statute which provides that every person concerned in the
commission of an offense may be charged as a principal." 271 Mich. at 561-62.

See *People v. Marshall*, 132 Cal. App. 2d 18, 281 P.2d 260 (1955). In the present case, the inclusion of the aiding and abetting language further clarifies the charges made against the defendant and does not render the information defective.

The defendant also argues that the amended information is defective in that it did not allege that the defendant killed Cecil Bammes or that there was a killing. Defendant claims such omission renders the information fatally defective because it omits an essential element of first-degree murder. The aggravated robbery count, of which the defendant was acquitted, did state that Cecil Bammes was killed during the course of the robbery. However, since the State did not attempt to incorporate by reference the allegations of Count 2 into Count 1, the State cannot rely on the allegation in Count 2 to cure a defect in Count 1. See *State v. Jackson*, 239 Kan. 463, 466, 721 P.2d 232 (1986). We agree that the information must allege each essential element of the offense charged, and a conviction based upon an information which fails to do so is void. *State v. Micheaux*, 242 Kan. 192, 196, 747 P.2d 784 (1987); *State v. Bird*, 238 Kan. 160, 708 P.2d 946 (1985). We do not, however, find that Count 1 is defective. While we agree with the defendant that the information does not separately and explicitly state that Bammes died, the information does state that the defendant did "unlawfully, willfully and feloniously . . . intentionally counsel, aid, abet or procure two Mexican males . . . to kill and murder a certain human being, namely: Cecil E. Bammes, by shooting him in the head with a small caliber pistol or revolver, believed to be an R&G .22 caliber blue steel revolver, . . . said crime defined as MURDER IN THE FIRST DEGREE." Although we have held that an information which charges an offense in the language of the statute is sufficient, the exact statutory words need not be used if the meaning is clear. *State v. Micheaux*, 242 Kan. at 197; *State v. Bishop*, 240 Kan. 647, 652, 732 P.2d 765 (1987). In *Micheaux*, we said:

"The general rule followed throughout the United States and in Kansas is that, *in charging a statutory offense, it is not necessary to use the exact words of the* statute. An indictment or information for an offense is sufficient if it follows the language of the statute substantially or charges the offense in equivalent words or others of the same import if the defendant is thereby fully informed of the particular offense charged and the court is able to see therefrom on what statute the offense is founded. . . .

. . . .

". . . From this long line of Kansas cases, we must conclude that an information which charges an offense in the language of the statute or its equivalent is sufficient, and, further, the exact statutory words need not be used in the information if the meaning is clear. While an information may be insufficient if it fails to allege an essential element of the offense, nevertheless, an information should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied." 242 Kan. at 197-99.

We conclude upon a careful reading of the information that the crime of felony murder was sufficiently charged in Count 1.

The defendant next contends that the district court erred in permitting the State to amend Count 3 of the amended information, which permitted the jury to find the defendant guilty of burglary if it found a burglary of either the house or the pickup truck.

The victim's body was found lying face down in his yard near his pickup truck. After the State finished the presentation of its evidence, the court permitted the State to amend the amended information by adding the term "or pickup truck" to Count 3. Thus, after the amendment, defendant was charged with burglarizing "the farm house or pickup truck of Cecil E. Bammes." Burglary was one of two underlying felonies alleged in Count 1, which was the felony-murder charge. Defendant contends that there was insufficient evidence to convict him of a burglary of the pickup truck, and, because there is an uncertainty as to whether the jury in its general verdict found him guilty of burglarizing the house or the pickup truck, his conviction for burglary and felony murder must be reversed.

The State argues that it is unnecessary to determine whether the defendant's felony-murder conviction rests upon the burglary of the house or the burglary of the pickup truck. The State cites *People v. Guffie*, 749 P.2d 976 (Colo. App. 1987), in support of its argument. In *Guffie*, the defendant contended that his conviction for felony murder could not stand, since the jury had returned only a general verdict of guilty and did not specify

which of the two possible robbery victims it concluded he had in fact robbed. The Colorado Court of Appeals upheld the conviction, stating:

"Unanimity in a verdict means only that each juror agrees that each element of the crime charged has been proven to that juror's satisfaction beyond a reasonable doubt. Jurors are not required to agree on what particular evidence is probative on a specific element of a crime, particularly if the evidence supports alternative theories of how that element occurred. [Citation omitted.]

". . . Hence, the felony element of felony murder may be satisfied by a showing that the decedent was killed during the commission of an aggravated robbery of one of several alternative victims. It is therefore not necessary that jury members unanimously agree on the specific victim of the underlying felony in convicting a defendant of felony murder, provided each juror is convinced beyond a reasonable doubt of the aggravated robbery of any one or more of the alternative victims." 749 P.2d at 979-80.

The State's reliance upon *Guffie* is misplaced. *Guffie* simply stands for the proposition that, where there is sufficient evidence to support two or more alternative felony theories, a jury need not designate which felony theory it is relying upon in convicting the defendant for felony murder. The *Guffie* court expressly found that there was sufficient evidence to support a conviction of the defendant for the robbery of either of the two alternative victims:

"Here, sufficient evidence was presented from which the jury could have found that defendant killed the homicide victim while robbing him or assisting in his robbery; there was also sufficient evidence that defendant robbed or assisted in the robbery of both the second victim and his girlfriend. The jury was properly instructed on complicity. Because there was sufficient evidence of alternative means of committing felony murder, jury unanimity as to the identity of an aggravated robbery victim of the underlying felony was not required." *Guffie*, 749 P.2d at 980.

The rule stated in *Guffie* has no application where one of the alternative felony theories is invalid, either on constitutional grounds or for a lack of sufficient evidence to support an independent conviction of the defendant on one of the felony theories.

In *State v. Green*, 94 Wash. 2d 216, 616 P.2d 628 (1980), the defendant was convicted of aggravated first-degree murder "in the course of or in furtherance of rape in the first degree or kidnapping in the first degree." 94 Wash. 2d at 230. After concluding that there was insufficient evidence to support a conviction of the defendant for kidnapping, the Washington Supreme

Court held that the murder conviction could not stand, and remanded the case for a new trial. Since there was insufficient evidence to support one of the felony theories upon which the murder conviction was based, the murder conviction could not stand.

"In the instant case, the jury instructions and verdict form did not require the jury to unanimously find appellant committed or attempted to commit either first degree kidnapping or rape or both. As instructed, it was possible for the jury to have convicted Green with six jurors resting their belief of guilt upon kidnapping and the other six resting their belief upon rape. Thus, it is impossible to know whether the jury unanimously decided that the element of rape had been established beyond a reasonable doubt." 94 Wash. 2d at 233.

In *Stromberg v. California*, 283 U.S. 359, 75 L. Ed. 1117, 51 S. Ct. 532 (1931), the United States Supreme Court recognized that a general verdict of guilty could not stand if the jury relied upon two or more independent grounds, one of which was insufficient. In *Stromberg*, the appellant was convicted of violating a California penal statute which condemned the display of a flag for any one of three purposes. The jury was instructed:

" 'Proof, beyond a reasonable doubt, of any one or more of the three purposes alleged in said information is sufficient to justify a verdict of guilty under count one of said information.' " 283 U.S. at 364.

The United States Supreme Court set aside the appellant's conviction, stating:

"We are unable to agree with this disposition of the case. The verdict against the appellant was a general one. It did not specify the ground upon which it rested. As there were three purposes set forth in the statute, and the jury were instructed that their verdict might be given with respect to any one of them, independently considered, it is impossible to say under which clause of the statute the conviction was obtained. If any one of these clauses, which the state court has held to be separable, was invalid, it cannot be determined upon this record that the appellant was not convicted under that clause. . . .

. . . .

". . .The first clause of the statute being invalid upon its face, the conviction of the appellant, which so far as the record discloses may have rested upon that clause exclusively, must be set aside." 283 U.S. at 367-70.

In *Zant v. Stephens*, 462 U.S. 862, 77 L. Ed. 2d 235, 103 S. Ct. 2733 (1983), the United States Supreme Court discussed the rule of *Stromberg*:

"One rule derived from the *Stromberg* case is that a general verdict must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient, because the

verdict may have rested exclusively on the insufficient ground. The cases in which this rule has been applied all involved general verdicts based on a record that left the reviewing court uncertain as to the actual ground on which the jury's decision rested. See, *e.g., Williams v. North Carolina*, 317 U.S. 287 [, 292, 87 L. Ed. 279, 63 S. Ct. 207] (1942); *Cramer v. United States*, 325 U.S. 1, 36, n 45 [, 89 L. Ed. 1441, 65 S. Ct. 918] (1945); *Terminiello v. Chicago*, 337 U.S. 1, 5-6 [, 93 L. Ed. 1131, 69 S. Ct. 894] (1949); *Yates v. United States*, 354 U.S. 298, 311-312 [, 1 L. Ed. 2d 1356, 77 S. Ct. 1064] (1957)." 462 U.S. at 881.

The State responds by contending, in essence, that the house and pickup truck were within the same curtilage; further, that theft was an element of the burglary and, since Kansas follows the "single impulse larceny theory," there could be only one theft, hence only one burglary. Simply stated, the State contends this was one continuous act of burglary and, while the evidence might or might not be sufficient to support a conviction of burglary of the pickup truck alone, there was sufficient evidence to support "that one or both of the house and/or pickup truck, both within the curtilage of the Bammes farmstead, was in fact burglarized." If the State's argument is to prevail, it must find support in K.S.A. 21-3715, which provides:

"**Burglary.** Burglary is knowingly and without authority entering into or remaining within any building, mobile home, tent or other structure, or any motor vehicle, aircraft, watercraft, railroad car or other means of conveyance of persons or property, with intent to commit a felony or theft therein."

The word "curtilage" does not appear in the statute; however, building and motor vehicle are specifically included. In *State v. Fisher*, 232 Kan. 760, 658 P.2d 1021 (1983), this court rejected the State's argument that anything capable of being constructed is a structure and hence legally capable of being burglarized. In *Fisher*, we held that hog pens enclosed by a fence were not included in the "or other structure" language of K.S.A. 21-3715. In so holding, Justice McFarland speaking for a unanimous court, said:

"The hog pens in question are essentially small areas enclosed by three-foot-high fences. Obviously, the only persons to whom such low sides would constitute actual physical barriers are young children. The applicable rules of statutory construction do not support the inclusion of fenced areas such as these hog pens within the term 'structure' as used in K.S.A. 21-3715.

"It is a fundamental rule penal statutes must be strictly construed in favor of the persons sought to be subjected to their operation. The rule of strict construction simply means ordinary words are to be given their ordinary meanings. Such a statute should not be read so as to add to or to subtract from that which is readily found therein. *State v. Conner*, 4 Kan. App. 2d 207, 209, 603 P.2d 1038 (1979),

rev. denied 227 Kan. 927 (1980); *State v. Floyd*, 218 Kan. 764, 766, 544 P.2d 1380 (1976); *Esters v. State*, 1 Kan. App. 2d 503, Syl. ¶ 3, 571 P.2d 32 (1977)." 232 Kan. at 761-62.

"It is quite clear that an otherwise open area enclosed by a low fence is not a structure within the meaning of the criminal trespass statute, K.S.A. 21-3721. The crimes of burglary and criminal trespass are, of course, closely related. This relationship was discussed in [*State v.*] *Williams* [, 220 Kan. 610, 556 P.2d 184 (1976),] as follows:

" 'In the Kansas criminal trespass statute the properties sought to be protected are land, structures, vehicles, aircraft or watercraft. Except for land these are some of the same properties named in the Kansas burglary statute. Both statutes relate to a knowing and unauthorized entry or remaining within the properties. However, the burglary statute has for its purpose the protection of the property and the occupants from a felony or theft therein, while the trespass statute has for its purpose merely a restriction against the unauthorized entry or remaining within the property.' 220 Kan. at 613-14.

"It would be rather incongruous if such a three-foot-high fenced enclosure were to be held a structure for purposes of the burglary statute when the same is clearly not a structure for purposes of the criminal trespass statute.

"No Kansas cases have been found where penetration of low-fenced enclosures, such as the hog pens herein, have been held to constitute burglary. The following are examples of the traditional type of buildings and structures which have previously been held to have been capable of being burglarized: a granary, which has a floor, door and roof, *State v. Groning*, 33 Kan. 18, 5 Pac. 446 (1885); *State v. Martin*, 223 Kan. 78, 573 P.2d 576 (1977); a buggy house, *State v. Garrison*, 52 Kan. 180, 34 Pac. 751 (1893); a chicken house, which has walls, doors and a roof, *State v. Poole*, 65 Kan. 713, 70 Pac. 637 (1902); a cave which has a door attached to it and is used for the storage of vegetables and victuals, *State v. Sanders*, 81 Kan. 836, 106 Pac. 1029 (1910); and a movable freight car, *State v. Mooney*, 93 Kan. 353, 144 Pac. 228 (1914)." 232 Kan. at 763.

We find no merit to the State's argument and conclude that, under the facts of the present case, a burglary of the pickup truck and the house were separate offenses. We must therefore determine if there is sufficient evidence to support a conviction of the defendant for burglarizing the pickup truck.

The standard in determining the sufficiency of the evidence in a criminal case is whether the evidence, "viewed in the light most favorable to the prosecution, convinces the appellate court that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Van Cleave*, 239 Kan. 117, 121, 716 P.2d 580 (1986). In the present case, the only evidence supporting a finding that the pickup truck had been burglarized is the photograph of the open door to the pickup truck. As the district court noted, this only proved the door was open when the picture was taken. There is no evidence that anything was

removed from the pickup truck, or that it had been touched or tampered with in any way. The victim's brother, Earl Bammes, testified that his brother always carried a rifle in the pickup truck. However, Elmer Bammes, Cecil's nephew, also testified that the only time he rode in Cecil's pickup truck, he did not see a rifle or a rifle rack. No rifle was found in the pickup truck after the discovery of the body. However, Earl and Elmer testified as part of a proffer to the court in chambers, and not in open court. No evidence was presented to the jury of any property missing from the truck. Viewed in the light most favorable to the prosecution, the evidence is not such that a rational factfinder could have found beyond a reasonable doubt that the pickup truck had been burglarized.

Since one of the two alternative burglary theories advanced by the State is not supported by sufficient evidence, the defendant's conviction for burglary and his conviction for felony murder based upon that burglary must be reversed. Although our decision is dispositive of this appeal, and this case must be remanded for a new trial, other issues raised in this appeal may be raised in the second trial. For that reason, we will consider some of those issues at this time.

The defendant argues that it was fundamentally unfair and a violation of due process of law to apply the principles of criminal liability expressed in the aiding and abetting statute in combination with felony murder. Defendant contends it is unjust to combine the concepts of aiding and abetting with felony murder.

The defendant presents no support for his argument other than a citation to cases which merely state the general rule that the independent actions of one conspirator, which are not the natural and probable outcome of the common design of the conspiracy and outside its common purpose, are not chargeable to the other members of the conspiracy. See *State v. Keleher*, 74 Kan. 631, 87 Pac. 738 (1906); *State v. Furney*, 41 Kan. 115, 21 Pac. 213 (1889). Nothing in either case suggests that a person who intentionally aids, abets, advises, hires, counsels, or procures another to commit a felony inherently dangerous to human life is not guilty of felony murder when a death occurs during the commission of that felony. Indeed, the position advanced by the defendant is inconsistent with the recent decision of this court in *State v. Dunn*, 243 Kan. 414, 758 P.2d 718 (1988). In *Dunn*, this court

affirmed the defendant's felony-murder convictions, which were based upon her intentionally aiding and abetting the commission of the underlying felonies. The court stated:

"A person is criminally responsible for the crimes of others if that person intentionally aids and abets the others in the commission of the crime. K.S.A. 21-3205. The element of intent necessary in aiding and abetting may be inferred from circumstantial evidence. *State v. Goering*, 225 Kan. 755, 758, 594 P.2d 194 (1979). Here, Dunn was present at the crime scene and there was evidence that she acted in furtherance of the offense. The jury concluded that Dunn was a knowing participant in the crimes of aggravated robbery and/or aggravated kidnapping. This felonious intent is sufficient for conviction of felony murder." 243 Kan. at 431.

Next, the defendant argues that the trial court erred in refusing to suppress evidence of the extrajudicial statements he made to law enforcement officers. The defendant asserts two grounds for excluding evidence of his extrajudicial statements. First, he contends that the State has failed to establish that the statements were voluntarily made, or made in compliance with K.S.A. 75-4351. That statute provides in part:

"A qualified interpreter shall be appointed in the following cases for persons whose primary language is one other than English . . . .

. . . .

"(e) when such person is arrested for an alleged violation of a criminal law of the state or any city ordinance. Such appointment shall be made prior to any attempt to interrogate or take a statement from such persons."

The evidence in the record indicates that the district court did not err in concluding that the defendant's statements were voluntarily and understandingly made. Agent Thompson testified that, while he interrogated the defendant at a slower pace than normal, defendant gave very specific answers to specific questions during the interrogation. Investigator Schmidt testified that he at no time had any difficulty in communicating with the defendant. While Schmidt also spoke to the defendant slowly, he testified that he had no problems conversing with him. Another law enforcement officer also testified that he had no special problem in communicating in English with the defendant. In *State v. Zuniga*, 237 Kan. 788, 703 P.2d 805 (1985), this court stated:

"The purpose behind K.S.A. 75-4351(e) is to ensure that there is clear communication between one who is in custody and the officers who are questioning him. The statute does not state a rule of evidence. Whether or not an interpreter is appointed and is present at the taking of the statement, the trial court must still

determine whether an in-custody statement was freely, voluntarily and knowingly given, with knowledge of the *Miranda* rights. That determination must be based upon the totality of the circumstances. In *State v. Newfield*, 229 Kan. 347, 357, 623 P.2d 1349 (1981), we said:

" 'In determining the voluntariness of a confession, it is to be viewed in light of the totality of circumstances, including the following factors: (1) The duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. Essential to the inquiry is the determination that the statement was the product of the free and independent will of the accused. If the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary. *State v. Prince*, 227 Kan. 137, 144, 605 P.2d 563 (1980); *State v. Watkins*, 219 Kan. 81, 97, 547 P.2d 810 (1976); *State v. Creekmore*, 208 Kan. at 934. The burden of proving the statement was voluntary rests with the State. *State v. Kanive*, 221 Kan. at 35.' " 237 Kan. at 791-92.

The trial court, in the present case, as in *Zuniga*, after conducting a full hearing on the issue, concluded that the statements given by the defendant to law enforcement officers were freely, voluntarily, and knowingly given. The evidence in the record does not support a conclusion that the trial court abused its discretion in refusing to suppress the defendant's extrajudicial statements.

The defendant also argues that the trial court erred in failing to suppress his statement to Investigator Schmidt that defendant had gone to the Bammes farm to "rob" the house. During the interrogation on the morning of May 22, 1986, Investigator Schmidt told defendant that he did not believe his story. Schmidt asked the defendant whether he had gone to the Bammes farm to kill Bammes or to rob him. Defendant replied that he had not gone to the farm to kill Bammes, but to "rob" the house.

The defendant contends that his statement should have been suppressed as an involuntary reaction to improper tactics by the interrogator. However, there is nothing in the record to indicate that Schmidt's question was unfair or that it deprived defendant of the ability to freely, voluntarily, and knowingly respond.

Finally, the defendant contends that the district court abused its discretion in admitting into evidence State's Exhibit 19, a .22 caliber semi-automatic rifle. The defendant contends that there was insufficient evidence to establish that Exhibit 19, the rifle purchased by Hluz, was the .22 caliber rifle taken from the Bammes farm. The defendant also contends that the prejudicial

effect of the rifle's presence in the courtroom outweighed any probative value it may have had.

The general rules relating to the introduction into evidence of physical objects were discussed in *State v. Nicholson*, 225 Kan. 418, 590 P.2d 1069 (1979):

"The admissibility of physical evidence lies within the sound discretion of the trial court and is to be determined on the basis of its relevance in connection with the accused and the crime charged. *State v. Nemechek*, 223 Kan. 766, 769, 576 P.2d 682 (1978); *State v. Smallwood*, 223 Kan. 320, Syl. ¶ 3, 574 P.2d 1361 (1978) and cases cited therein. See also *State v. Treadwell*, 223 Kan. 577, 579, 575 P.2d 550 (1978). Moreover, relevant evidence is defined under K.S.A. 60-401(*b*) as evidence having any tendency in reason to prove any material fact. The determination of relevancy is a matter of logic and experience, not a matter of law. *State v. Nemechek*, 223 Kan. at 769-770; see also *State v. Alderdice*, 221 Kan. 684, 689, 561 P.2d 845 (1977); *State v. Faulkner*, 220 Kan. 153, 155, 551 P.2d 1247 (1976). Furthermore, when a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it. *State v. Boone*, 220 Kan. 771, Syl. ¶ 3, 556 P.2d 880 (1976)." 225 Kan. at 419-20.

In the present case, the victim's brother testified that Exhibit 19 was "just like" one of the rifles his brother had owned. The defendant had sold Exhibit 19 to Hluz the day after the alleged burglary. Michael Rodriguez testified that when the two variously identified Mexican males returned from the Bammes house on the evening of May 16, one of them was carrying a large, long object under a blanket. Joe Cueva testified that when he saw the defendant's car on the evening of May 16, there were two rifles on the floor of the car. The evidence was relevant, and the defendant's objection goes to the weight and not the admissibility of Exhibit 19. The district court did not err in admitting Exhibit 19 into evidence.

The judgment is reversed and the case is remanded for a new trial.