(997 P.2d 737)
No. 80,292

STATE OF KANSAS, *Appellee*, v. EDWARD E. ICE, JR., *Appellant*.

—

Opinion filed February 11, 2000.

*Janine Cox* and *Mary D. Prewitt*, assistant appellate defenders, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

No appearance for the appellee.

Before ELLIOTT, P.J., PIERRON and KNUDSON, JJ.

PIERRON, J.: Edward Ice, Jr., appeals his conviction for rape.

On the night of June 8, 1996, 17-year-old R.D.B. and Ice were together in the residence of Steve Rist, who was on a trip. R.D.B. claimed Ice threatened her with a gun, forced her to drink alcohol at gunpoint, and forced her to have sex with him. R.D.B. testified she repeatedly told Ice to stop touching her privates during the alleged encounter and refused to drink the alcohol until he pointed a gun at her head.

The physical evidence was inconclusive. An investigation revealed no evidence of vaginal trauma indicative of involuntary pen-

etration, no fresh bruising, and no semen deposits from the vaginal, oral, or rectal swabs. As a result, the chief evidence at trial consisted of R.D.B.'s account, Ice's testimony in which he denied having sex with R.D.B., the testimony of psychiatrist Dr. Reedy, the officer's testimony that Ice admitted to having sex with R.D.B., and Ice's written statement in which he acknowledged he agreed to have sex with R.D.B.

The State pursued two theories at trial: first, that R.D.B. was forced to have sex against her will, and second, that R.D.B. was incapable of consenting due to a mental deficiency. R.D.B. is educable mentally handicapped. Her condition arises from her premature birth with very low birth weight, hydrocephalus, and a series of brain infections occurring over the first few months of her life. Her IQ is approximately 65.

Both the State and defense counsel extensively examined R.D.B. concerning her depth of understanding about sex. She testified that when someone says "no" to sex, "they mean no." R.D.B. testified she had taken a sex education class and knew she should use protection during sex and that condoms protected you from AIDS. She testified she knew that sex was when a man put his penis into a woman's vagina and that married people had sex if they wanted to have a child. R.D.B. stated: "When you don't want that person to put their penis in your vagina, you should tell them no and if they keep doing it, that's more or less a rape." She was able to identify certain ways Ice had touched her, such as touching her vagina, fondling her breasts, and engaging in intercourse. It was clear she knew the touchings were sexual in nature and knew the penis, vagina, and breasts had sexual functions. She distinguished sex between married people for the purpose of having children and the encounter between herself and Ice, saying, "There shouldn't be no purpose for him to do that to me." On continued cross-examination, she said, "I told him to stop doing it. He won't stop. He kept on going and I was—and it really did hurt me and I did cry. I didn't like it."

The State presented testimony from Dr. Reedy, a psychiatrist who had examined R.D.B. at the request of the defense. Dr. Reedy had reviewed school records, medical records, another examiner's

psychiatric report, police reports, and had interviewed R.D.B. personally. He placed her mental age at around 8 or 9 years old, with a commensurate ability to understand social situations and make judgments based upon her understanding. He noted that in a person with brain damage and impulsive disorders, alcohol would be far more detrimental to that person's judgment than to other people. He testified, over the defense's objection, that

"[R.D.B.'s] intellectual abilities, which are very much below par—not just the numbers, but also her social functioning, which is very commensurate with her low level of intellect—makes her unable to understand the extent of the behaviors, consequences regarding many situations, including sexual activity."

Reedy added that R.D.B.'s ability to understand the consequences of sexual acts was impaired significantly.

Other witnesses included lab technicians, the arresting officer, and R.D.B.'s teachers and counselors. Their testimony was collateral to the main issue raised in this appeal—R.D.B.'s capacity to consent.

Regarding rape, the court gave the following instruction to the jury, following K.S.A. 21-3502 and PIK Crim. 3d 57.01:

"The defendant is charged with the crime of rape. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
"1.   That the defendant had sexual intercourse with [R.D.B];
"2.   That the act of sexual intercourse was committed without the consent of [R.D.B] under circumstances when:
(a)   she was overcome by force or fear; or
(b)   she was physically powerless; or
(c)   she was incapable of giving a valid consent because of mental deficiency or disease, which condition was known by the defendant or was reasonably apparent to the defendant; or
(d)   she was incapable of giving a valid consent because of the effect of any alcoholic liquor, which condition was known by the defendant or was reasonably apparent to the defendant; and
"3.   That this act occurred on or about the 9th day of June, 1996, in Chautauqua County, Kansas."

The jury convicted Ice of rape, but acquitted him of furnishing alcohol to a minor and intimidation of a witness. Ice appeals, mainly

raising issues related to R.D.B.'s capacity or lack thereof to consent to sex. After receiving two extensions, the State did not file a brief.

Ice challenges the expert testimony, the jury instructions, and the evidence supporting the State's claim that R.D.B. was unable to consent. These arguments are intertwined and illustrate a single basic problem—under any sensible definition of ability to consent, R.D.B.'s testimony conclusively established she was capable of consenting to the sexual act despite her mental infirmities. This is despite Dr. Reedy's expert testimony.

Section (2) of the instruction lists the alternative means by which Ice could have performed a sexual act without R.D.B.'s consent. The jury could have found him guilty based on any or all of the elements listed in the section. In an alternative means case, unanimity is not required as to the means by which the crime was committed so long as substantial evidence supports each alternative means.

Ice points to R.D.B.'s testimony in which she emphatically denied she had given consent, indicating she understood what was going on. R.D.B.'s testimony is conclusive evidence that she had an understanding about what sex is and that she could agree or refuse to participate. The question central to the appeal is whether her level of comprehension precludes a finding she was unable to legally consent to a sexual act.

K.S.A. 21-3502(a)(1)(C) provides:

"(a) Rape is: (1) Sexual intercourse with a person who does not consent to the sexual intercourse, . . .

. . . .

(C) when the victim is incapable of giving consent because of mental deficiency or disease, or when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by the offender or was reasonably apparent to the offender."

The test for consent under that provision is whether the individual understands the nature and consequences of the proposed act. See *State v. Juarez,* 19 Kan. App. 2d 37, 40, 861 P.2d 1382 (1993), *rev. denied* 254 Kan. 1009 (1994). Therefore, in order to preserve the constitutionality of the provision, the definition of "nature and consequences" must be sufficiently clear to permit the person pro-

posing sex, and the jury, to discern whether the individual can give legal consent. If an individual can comprehend the sexual nature of the proposed act, can understand he or she has the right to refuse to participate, and possesses a rudimentary grasp of the possible results arising from participation in the act, he or she has the capacity to consent. Anything more open-ended would become impermissibly vague.

As noted, R.D.B. testified she had told Ice repeatedly she did not want to have sex, she understood she was being forced to have sex, and she knew of the risk of pregnancy and AIDS, and she identified specific sexual activities. Her testimony was lucid throughout direct and cross-examination, her account was specific, and she repeatedly affirmed she resisted and was overcome. Whether the jury believed or disbelieved R.D.B.'s claim that Ice forced her to have sex, her testimony shows she understood what was going on quite well. It is difficult to see what else the "nature and consequences" test would require.

Dr. Reedy determined that R.D.B. was able to understand the immediate consequence of her behaviors, but then stated in his report:

"[R.D.B.] clearly maintains that she had not given any consent and was opposed to such activity. However, it should be kept in mind that [R.D.B.] is 17 years old and is subject to such natural urges like any other 17 year old female. . . . She has difficulty comprehending the consequences of her behaviors in a broader sense beyond the concrete sense."

Dr. Reedy does not explain why the test for legal capacity to consent would require any understanding of consequences beyond the concrete. Dr. Reedy testified that R.D.B.'s inability to understand consequences of specific acts "impairs significantly" her ability to consent to sexual acts. This is simply too vague to support a finding beyond a reasonable doubt that she was incapable of consent. The test is not whether the individual is impaired, but whether the individual is incapable of knowingly consenting. There is no evidence in the record that R.D.B. lacked the volitional capability to refuse or to give consent to sex. At best, she was suggestible under certain circumstances. In this case, she testified she did not consent—she resisted.

The jury instruction for rape presented a number of alternative means by which the jury could have determined lack of consent. At least one means, that of mental deficiency, was not proven by sufficient evidence. As a result, one or more jurors may have convicted Ice on legally insufficient evidence. The question is whether this possibility requires a remand for a new trial.

"Where a single offense may be committed in more than one way, there must be jury unanimity as to the crime charged, but unanimity is not required as to the means by which the crime was committed so long as substantial evidence supports each alternative means." *State v. Carr*, 265 Kan. 608, 618, 963 P.2d 421 (1998) (citing *State v. Timley*, 255 Kan. 286, Syl. ¶ 1, 875 P.2d 242 [1994]); see also, *e.g., State v. Higgenbotham*, 264 Kan. 593, 609, 957 P.2d 416 (1998) (test is whether rational factfinder could have found each means beyond a reasonable doubt).

The court used more emphatic language in *State v. Garcia*, 243 Kan. 662, Syl. ¶ 6, 763 P.2d 585 (1988): "A general verdict of guilty must be set aside if the jury was instructed that it could rely on any of two or more independent grounds, and one of those grounds is insufficient."

However, in *State v. Grissom*, 251 Kan. 851, 892, 840 P.2d 1142 (1992), the court disapproved *Garcia*, relying on *Griffin v. United States*, 502 U.S. 46, 116 L. Ed. 2d 371, 112 S. Ct. 466 (1991). In *Griffin*, the defendant was charged with a single count of conspiracy, with dual aims of hindering the IRS and the Drug Enforcement Agency in their official duties. At trial, the Government failed to produce any evidence to prove interference with the Drug Enforcement Agency. The jury returned a general guilty verdict against Griffin and her two codefendants. 502 U.S. at 47-48.

The Court affirmed the conviction, concluding that where one of the possible bases of conviction was neither unconstitutional nor illegal, but "merely" unsupported by sufficient evidence, there is no constitutional problem. See *Griffin*, 502 U.S. at 60. The Court concluded there is a commonsense reason to distinguish between a jury instruction which misstates the law and one which presents a theory of conviction not supported by the evidence. 502 U.S. at 59. While the jury would not discern a mistake in the law as charged

to them, a court may be more confident the jury would reject a legal theory not supported by the facts. 502 U.S. at 59-60. *Grissom* followed *Griffin's* reasoning and concluded that where the State charged the defendant with murder, alleging alternative means of felony or premeditation, evidence of premeditation alone was enough to preserve the verdict. *Grissom*, 251 Kan. at 893. The Tenth Circuit has relied upon *Griffin* as well. See, *e.g.*, *U.S. v. Hanzlicek*, 187 F.3d 1228, 1236 (10th Cir. 1999) (error permissible if harmless beyond a reasonable doubt).

In the instant case, we have no idea whether the jury found Ice guilty of rape due to force and fear being used, or due to a lack of capacity of the victim to consent, or a combination of the two. This case differs from those where there was strong evidence supporting one theory and none on another, such as in *Griffin*. In a *Griffin* situation, one can reasonably assume the jury did not behave capriciously and convict on a theory in which there was no evidence, when there was strong evidence supporting another theory.

With so much testimony and prosecutorial effort invested in the "no capacity" theory, we cannot say there is no real possibility that the verdict here was based only on the force and fear theory. We must therefore reverse and remand for a new trial.

In *State v. Davis*, 247 Kan. 566, 573-74, 802 P.2d 541 (1990), the court implied that even if insufficient evidence exists to support an alternative means, the court may preserve the verdict if it finds no real possibility the jury would have reached a different verdict. That is not the case here.

Ice also claims the interviewing police officer forced him to give a confession and that he could not read the *Miranda* card he was given. Ice signed his confession, signed the back of the *Miranda* rights card, and provided a tape-recorded statement. Ice admitted he never told the officer he could not read. Ice's claim that he went along with the officer out of fear was minimally credible, and as factfinder, the jury was free to reject his testimony.

The defense also presented two trial witnesses who claimed the officer had threatened them. Without going into great detail, both witnesses, who were married to each other, testified to long-running conflicts with the officer, and both obviously felt considerable

animosity towards him. Further, one of the witnesses, Steve Rist, agreed that his taped statement, allegedly dictated by the officer, was substantively correct.

Reversed and remanded for a new trial.