NOT DESIGNATED FOR PUBLICATION

No. 118,705

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MARK EDWIN WISNER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GUNNAR A. SUNDBY, judge. Opinion filed January 25, 2019. Affirmed.

*Ryan J. Eddinger*, of Kansas Appellate Defender Office, for appellant.

*Michael G. Jones*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., LEBEN and BRUNS, JJ.

PER CURIAM: When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.

Mark Edwin Wisner appeals his convictions for aggravated criminal sodomy and aggravated sexual battery, arguing that the State failed to provide sufficient evidence to sustain the convictions. For the aggravated criminal sodomy charge, Wisner argues that the State failed to prove that the victim was overcome by force or fear. However, the

1

victim was pinned against a table and felt like he was unable to stop Wisner. The jury believed that the victim was overcome by force, and the evidence is sufficient to support such a finding.

For the aggravated sexual battery charge, Wisner argues that numerous narcotic medications the victim was taking did not render him incapable of giving consent. This charge required the State to prove not only that the victim was impaired, but that the impairment rendered the victim unable to understand the nature and consequences of Wisner's actions. After a thorough review of the evidence presented, we find that the State provided sufficient evidence of impairment and that the impairment rendered the victim incapable of understanding the nature and consequences of Wisner's actions. Accordingly, both convictions are affirmed.

FACTUAL AND PROCEDURAL HISTORY

Wisner was a physician's assistant at the United States Department of Veterans Affairs (VA) hospital in Leavenworth, Kansas. The State initiated an investigation against Wisner after receiving reports that he was making inappropriate comments to patients and performing unnecessary genital exams. The investigation culminated in the State filing a criminal complaint against Wisner, charging him with one count of aggravated criminal sodomy, one count of aggravated sexual battery, and three counts of sexual battery. The case was heard by a jury. Multiple victims testified. We will only recount the facts as they relate to the convictions Wisner has challenged on appeal.

D.M. is an Army veteran. He sustained multiple physical injuries during his deployment in Iraq. Upon completing his active duty in 2008, he returned to Leavenworth. D.M. sought treatment for his injuries at the VA hospital in Leavenworth. Wisner was assigned as D.M.'s primary care provider. Initially, D.M. saw Wisner a few times a year. However, beginning in 2012 and lasting until 2014 he saw Wisner about

2

five times a week. D.M. reported that the increase in his visits to Wisner was for medication. The medications were used to treat D.M.'s back pain and consisted of a variety of opioids such as oxycodone, morphine, Dilaudid, and Demerol.

Wisner told D.M. that due to the type of back injury he had, which affected the nerves in his lower lumbar region, it was necessary for Wisner to perform genital exams. Wisner started performing these genital exams in 2012. He would ask D.M. to come to his office after his patients for the day had left. Wisner would then ask D.M. to pull down his pants and, without gloves, he would touch D.M.'s genitals and the surrounding area. D.M. believed that Wisner performed approximately 40 to 50 genital exams.

At the time, D.M. believed Wisner's explanation as to why the exams and medications were necessary. However, he was also heavily medicated. In one month, D.M. would take seven hundred and twenty 5-milligram oxycodone pills, ninety 30-milligram instant release morphine pills, ninety 60-milligram extended release morphine pills, thirty to sixty 4-milligram Dilaudid pills, and injections of Demerol about four times per week. Wisner provided all of the medications to D.M. Sometimes D.M. would obtain medicine via a prescription filled at a pharmacy. But other times Wisner would personally supply the medicine to D.M.

D.M. eventually ended up in a wheelchair due to over prescription of narcotics. He could not stand up without passing out. At trial, D.M. compared the effects of his medicine to heroin. He was unable to describe his mental state during the genital exams, stating that he "was in better condition as a drunk driver than I was when I was driving on opioids." At the time, he "believed that [he] was under control." But he later discovered that he was "probably similar to a junk[ie] more so than a human being, as far as cognitive thought, care, anything of that sort." Despite his impaired state, D.M. would often drive to his appointments with Wisner.

3

K.J. was another one of Wisner's patients. He suffered injuries to his back, foot, and knee while deployed in Kurdistan. He also had a diagnosis for prostatitis, unrelated to his military duty. He began seeing Wisner in December 2011. Between that time and May 2014, K.J. saw Wisner approximately three or four times. The first time he met with Wisner, Wisner performed a genital exam. K.J. believed the exam was a normal part of the physical examination for persons new to the VA. K.J.'s final appointment with Wisner was in May 2014. K.J. reported that he was experiencing symptoms of his prostatitis. Wisner assisted K.J. in lowering his underwear and had him lay on a table. Wisner then picked K.J.'s penis up with one hand and held K.J.'s testicles with his other hand. K.J. believed that Wisner looked at his penis for longer than was necessary, about 30 to 40 seconds, and then Wisner made a comment that K.J. was a handsome man.

Following the genital exam, Wisner told K.J. that he had to check K.J.'s prostate. Wisner got off of the table, turned around, and began to bend over when Wisner stopped him. Wisner told K.J. that there was a better way to do the exam. Wisner told K.J. to put his hands under his chin and to put his elbows down on the table. Wisner adjusted K.J. for a minute or a minute and a half, having K.J. bow his back and spread his legs. Wisner spread K.J.'s legs so far apart that K.J. had to remove his underwear from around his ankles. K.J. had never had a prostate exam where he had to assume such a position. He waited in the position for about a minute.

K.J. was expecting Wisner to perform a digital examination of his prostate. Instead, he said that Wisner felt something going into his anus considerably deeper than he had ever felt before. K.J. felt the push go into his abdomen. The force caused K.J. to fall onto his face. It was very painful. The insertion lasted approximately 20 seconds. When K.J. got back into position, the object had not completely left his anus. K.J. said that Wisner forced the object in for a second time, much deeper and much more painfully than the first time. K.J. felt like he was physically forced forward. At trial, K.J. testified that he did not think he had any way of stopping Wisner from repeating the action a

4

second time because he was "basically pinned up against the table." K.J. did not see what was inserted into his anus. After the second insertion, Wisner washed something in the sink but K.J. could not see what it was. K.J. had pain in his anus and abdomen for two to three days after the exam, as well as significant psychological issues.

Special Agent Kerry Baker is an investigator for the VA. He investigated the allegations against Wisner. Agent Baker interviewed Wisner in May 2014. During the interview, Wisner admitted that he inappropriately touched some of his patients. Agent Baker also sent questionnaires to Wisner's patients. K.J. and D.M. responded. After receiving additional information from the respondents, Agent Baker decided to interview Wisner again. Lieutenant Joshua Patzwald of the Leavenworth County Sheriff's Office accompanied Agent Baker. The second interview was recorded, and the audio was played for the jury. Wisner admitted that he likely overprescribed medication to D.M. and, if D.M. was taking the medications as prescribed, he would have been impaired.

The VA sent a letter to the Kansas State Board of Healing Arts informing the Board that a licensee had engaged in sexually inappropriate acts against veterans. The Board initiated an investigation into the claim. Wisner sent the Board a letter informing the Board that he was not fit to practice and asking to surrender his license. The Board sent Wisner a consent order for surrender of his medical license. Wisner agreed to the consent order. The consent order stated that Wisner repeatedly sexually assaulted his patients, had inappropriate sexual contact with his patients, made inappropriate sexual comments to his patients, and overprescribed medications.

A jury found Wisner guilty of both counts, as well as several others that are not challenged on appeal. The district court sentenced Wisner to 187 months in prison. Wisner now appeals his convictions for aggravated criminal sodomy and aggravated sexual battery.

5

*The State presented sufficient evidence to sustain Wisner's conviction for aggravated criminal sodomy against K.J.*

Wisner's first argument is that there was insufficient evidence to sustain his conviction for aggravated criminal sodomy against K.J.

The standard of review when a party challenges the sufficiency of the evidence is well-settled:

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.'" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

There are several ways to commit aggravated criminal sodomy, set forth in K.S.A. 2017 Supp. 21-5504(b). This statute provides:

> "(b) Aggravated criminal sodomy is:
> . . . .
> (3) sodomy with a victim who does not consent to the sodomy or causing a victim, without the victim's consent, to engage in sodomy with any person or an animal under any of the following circumstances:
> (A) When the victim is overcome by force or fear;
> (B) when the victim is unconscious or physically powerless; or
> (C) when the victim is incapable of giving consent because of mental deficiency or disease, or when the victim is incapable of giving consent because of the effect of any

6

alcoholic liquor, narcotic, drug or other substance, which condition was known by, or was reasonably apparent to, the offender."

The State charged Wisner under K.S.A. 2017 Supp. 21-5504(b)(3)(A). This meant that the State was required to prove that K.J. was overcome by force or fear. The parties agreed that there was no evidence of fear, so the court instructed the jury that it had to find that "[t]he act of sodomy was committed without the consent of K.J. under circumstances when he was overcome by force."

Wisner argues on appeal that there was insufficient evidence that K.J. was overcome by force. He notes that K.J. voluntarily removed his clothing for an exam related to his prostatitis. Wisner instructed K.J. on what position to take, and K.J. voluntarily assumed that position. Then, Wisner inserted an object into K.J.'s rectum. While the penetration caused K.J. to fall out of position, he voluntarily got back into position at which time Wisner penetrated his rectum for a second time. Wisner argues that although K.J. "testified the procedure was forceful, the evidence did not support the charge that the penetration was accomplished through force or fear." He admits that the evidence could support a charge under the theory that Wisner deceived him. But, the State did not make such a charge.

The parties do not dispute the facts, they only dispute whether the facts amount to aggravated criminal sodomy as defined by K.S.A. 2017 Supp. 21-5504(b)(3)(A). The Kansas Supreme Court has discussed the meaning of the word "force" as used in Kansas' rape statute. The definition of rape is similar to aggravated criminal sodomy, and is defined as "sexual intercourse with a victim who does not consent to the sexual intercourse . . . [w]hen the victim is overcome by force or fear." K.S.A. 2017 Supp. 21-5503(a)(1)(A). The court has "declined to define in absolute terms the degree of force required to sustain a rape conviction." *State v. Chaney*, 269 Kan. 10, 20, 5 P.3d 492 (2000). However, it has explained what is not required to prove force:

"The 'force' required to sustain a rape conviction in this state does not require that a rape victim resist to the point of becoming the victim of other crimes such as battery or aggravated assault. K.S.A. 21-3502 [now K.S.A. 2017 Supp. 21-5503] does not require the State to prove that a rape victim told the offender she did not consent, physically resisted the offender, and then endured sexual intercourse against her will. It does not require that a victim be physically overcome by force in the form of a beating or physical restraint. It requires only a finding that she did not give her consent and that *the victim was overcome* by force or fear to facilitate the sexual intercourse." *State v. Borthwick*, 255 Kan. 899, 914, 880 P.2d 1261 (1994).

The court has also "recognized that force or fear within the definition of rape is a highly subjective concept that does not lend itself to definition as a matter of law." *State v. Tully*, 293 Kan. 176, 198, 262 P.3d 314 (2011) (citing *Chaney*, 269 Kan. at 20).

Here, there is sufficient evidence when viewed in the light most favorable to the State for a reasonable fact-finder to conclude that K.J. was overcome by force. It is true that Wisner did not use force to position K.J. But, once K.J. was in position Wisner inserted an object into K.J.'s rectum with so much force that it pushed K.J. forward onto the exam table. K.J. was able to reposition himself, but the object was still in his rectum. Then, Wisner pushed the object in again even more deeply. K.J. testified that he felt he had no way of stopping Wisner from going in for a second time because Wisner was physically forcing the object through K.J.'s body while pinning him against the table. This is consistent with what K.J. reported to Agent Baker—that he felt Wisner's "body against him, and he felt pinned down to the table and unable to respond and unable to react."

The jury believed K.J.'s testimony that he felt unable to stop Wisner. This court does not reassess witness credibility. And, there is nothing in the record that would render K.J.'s testimony so improbable as to defy belief. See *State v. Matlock*, 233 Kan. 1, 3, 660 P.2d 945 (1983) (noting that "in order to convict on the uncorroborated testimony of the

8

prosecutrix, the testimony of the prosecutrix must be clear and convincing, and that where her testimony is so incredible and improbable as to defy belief, the evidence is *not* sufficient to sustain a conviction"). K.J.'s testimony was sufficient to prove that he was overcome by force. Therefore, Wisner's conviction for aggravated criminal sodomy is affirmed.

*There was sufficient evidence to sustain Wisner's conviction for aggravated sexual battery against D.M.*

Wisner also argues that the evidence was insufficient to prove that he committed aggravated sexual battery against D.M.

As with the previous issue, this court's standard of review requires it to review the evidence in the light most favorable to the State. *Chandler*, 307 Kan. at 668. If this court is convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt, then it must affirm the conviction. 307 Kan. at 668.

There are several ways for the State to prove aggravated sexual battery, as defined by K.S.A. 2017 Supp. 21-5505(b). This statute provides:

> "(b) Aggravated sexual battery is the touching of a victim who is 16 or more years of age and who does not consent thereto with the intent to arouse or satisfy the sexual desires of the offender or another and under any of the following circumstances:
> (1) When the victim is overcome by force or fear;
> (2) when the victim is unconscious or physically powerless; or
> (3) when the victim is incapable of giving consent because of mental deficiency or disease, or when the victim is incapable of giving consent because of the effect of any alcoholic liquor, narcotic, drug or other substance, which condition was known by, or was reasonably apparent to, the offender." K.S.A. 2017 Supp. 21-5505(b).

9

The State charged Wisner under K.S.A. 2017 Supp. 21-5505(b)(3), meaning that it had to prove that D.M. was incapable of giving consent due to the effects of the prescription drugs he was using.

"Like force or fear, incapacity to consent is a highly subjective concept. It is not one which lends itself to definition as a matter of law." *Chaney*, 269 Kan. at 20. Although difficult to define, this court has held that "[t]he test for consent . . . is whether the individual understands the nature and consequences of the proposed act." *State v. Ice*, 27 Kan. App. 2d 1, 4, 997 P.2d 737 (2000). "If an individual can comprehend the sexual nature of the proposed act, can understand he or she has the right to refuse to participate, and possesses a rudimentary grasp of the possible results arising from participation in the act, he or she has the capacity to consent." 27 Kan. App. 2d at 5.

Wisner notes that D.M. was on numerous narcotic medications. He states that the amount of drugs D.M. consumed could seem "staggering" to a juror. However, he argues that habitual drug users can "develop tolerance to narcotics and may function as though seemingly unimpaired." Because of this, Wisner argues that the State should have provided "evidence, in the form of expert testimony, to directly establish the level of intoxication DM was under during specific office visits when he was subjected to genital examinations." Additionally, he asserts that the State did not provide any evidence that the specific medications D.M. was taking affect a person's ability or D.M.'s ability as an individual to make consensual decisions.

But juries do not require expert testimony to find that a victim was incapable of consent. See *Keim v. State*, 13 Kan. App. 2d 604, 608, 777 P.2d 278 (1989) (the statute "sufficiently warns a person of common intelligence that engaging in sexual intercourse with one who is mentally handicapped to a degree that he or she cannot understand the nature and consequences of engaging in the act is prohibited"). Juries are comprised of persons of common intelligence. Thus, "when the capacity of a mentally deficient

10

individual to consent to a sexual act is at issue, the jury is capable of determining whether that individual is able to understand the nature and consequences of engaging in such an act." *State v. Juarez*, 19 Kan. App. 2d 37, 40, 861 P.2d 1382 (1993). When a jury makes such a determination, it "should evaluate the individual's behavior in normal social intercourse as well as consider any expert testimony concerning the individual's mental deficiency." 19 Kan. App. 2d at 40. While "[m]edical, psychiatric, or psychological testimony may provide valuable expert evidence tending to prove—or disprove—the victim's incapacity to consent to sexual acts" this court has "never found . . . that such expert testimony is necessarily *required* in order to prove the victim was incapable of consent." *State v. Wallin*, 52 Kan. App. 2d 256, 263, 366 P.3d 651 (2016), *rev. denied* 305 Kan. 1257 (2017).

Given this caselaw, we reject Wisner's argument that the State needed to provide expert testimony to convict him of aggravated sexual battery. The State can prove this claim through evidence of D.M.'s behavior alone, provided that D.M.'s behavior shows he was incapable of understanding the nature and consequences of the sexual acts alleged.

The State cites several pieces of evidence that support the jury's finding: D.M.'s testimony, his medical records, Agent Baker's testimony, Lieutenant Patzwald's testimony, Wisner's admissions in his interview with Agent Baker, and the consent order. D.M. testified that he had used "enough oxycodone to be compared to heroin." He also testified that he had "been arrested for drunk driving, and [he] was in a better condition as a drunk driver than [he] was when [he] was driving on opioids." He further testified:

> "I believed that I was under control. But come to find out, I was actually probably similar to a junk[ie] more so than a human being, as far as cognitive thought, care, anything of that sort. I didn't have the ability to make those decisions because the amount of medication that I was taking daily."

11

D.M. made consistent statements to Lieutenant Patzwald, stating that he felt like he had been living in a fog while on narcotics. When Agent Baker interviewed D.M. he noted that D.M. had slurred speech and Baker was glad that D.M. did not drive to the interview. In the consent order, Wisner agreed that he overprescribed medications to some patients. In his interview with Agent Baker and Lieutenant Patzwald, one of the officers asked whether long-term narcotic pain management could cause a person to not think straight. Wisner said he believed that could happen and that he would have taken advantage of that impairment. Later, Wisner said that D.M. would have been impaired if he was using the amount of narcotics prescribed.

Wisner argues that D.M.'s behavior during the time in question demonstrated that he was not impaired. D.M. drove to many of his meetings with Wisner. D.M. was never stopped for driving under the influence and he was not in any car accidents. He did hit a curb, but it did not damage his vehicle. Wisner also notes that D.M. was able to recall specific facts from the exams, like that Wisner did not use gloves. Furthermore, the State alleged that the aggravated sexual battery occurred sometime between January 2012 and May 2014. D.M. was working as a consultant during this time. While he initially worked for Booz Allen Hamilton, which he described as one of the most prestigious consulting firms, he transferred to Cubic Applications Incorporated when it won the contract he was working on. D.M. stayed at that job until going on disability in October 2014.

Even though D.M. showed some signs of functionality by working and driving, the evidence clearly established that he was impaired by narcotics. But this alone is not enough to sustain Wisner's conviction. The evidence must show not only that D.M. was impaired, but that the impairment was to such a degree that it rendered him incapable of giving consent.

The idea that the State must prove more than just impairment is demonstrated in *Ice*, 27 Kan. App. 2d 1. There, the State charged Edward Ice with rape of R.D.B. under

12

two theories—that R.D.B. was forced to have sex against her will and that R.D.B. was incapable of consenting due to a mental deficiency. R.D.B. was mentally handicapped due to being born prematurely and having a series of brain infections in the first few months of her life. At trial, R.D.B. was asked numerous questions examining the depth of her understanding about sex. She described sex as a man putting his penis into a woman's vagina. She knew that married people have sex if they want to have a child, and that she should use condoms during sex to protect her from AIDS. She also said that saying no to sex meant a person was supposed to stop, and that "'if they keep doing it, that's more or less a rape.'" 27 Kan. App. 2d at 2. The State provided evidence from Dr. Reedy, a psychiatrist who had examined R.D.B. Dr. Reedy placed R.D.B.'s mental age at eight or nine years old. Dr. Reedy testified that "R.D.B.'s ability to understand the consequences of sexual acts was impaired significantly." 27 Kan. App. 2d at 3. Ice was convicted of rape, and he appealed.

The primary issue on appeal was whether R.D.B.'s "level of comprehension preclude[d] a finding she was unable to legally consent to a sexual act." 27 Kan. App. 2d at 4. This court held that R.D.B. had the capacity to consent. This was because "R.D.B. testified she had told Ice repeatedly she did not want to have sex, she understood she was being forced to have sex, and she knew of the risk of pregnancy and AIDS, and she identified specific sexual activities." 27 Kan. App. 2d at 5. The court discounted Dr. Reedy's testimony that R.D.B.'s ability to consent to sexual acts was significantly impaired by her inability to understand consequences of specific acts. The court stated: "The test is not whether the individual is impaired, but whether the individual is incapable of knowingly consenting. There is no evidence in the record that R.D.B. lacked the volitional capability to refuse or give consent to sex. At best, she was suggestible under certain circumstances." 27 Kan. App. 2d at 5.

So, *Ice* stands for the principle that the State must show more than just impairment—it must show that a person is so impaired that he or she is incapable of

consenting. Although Wisner argues that no reasonable juror would have accepted D.M.'s testimony that he was too impaired to consent to the acts perpetrated upon him, we disagree.

We find there was testimony in this case from which the jury could determine that D.M. did not comprehend the sexual nature of the genital exams, that he did not know he could refuse the exam, nor did he have at least a rudimentary grasp of what was happening to him. See *Ice*, 27 Kan. App. 2d at 4-5.

D.M. testified that Wisner was a father figure, counselor, and mentor to him. Wisner was a fellow veteran, who gained D.M.'s unwavering trust. D.M. testified that he had no reason to believe that anything Wisner was doing to him was outside standard medical care. Wisner told D.M. that due to the injury to the lower lumbar region of his back, Wisner needed to conduct genital exams. D.M. had no reason to doubt him. D.M. further testified that at the time he was seeing Wisner, Wisner was *prescribing* seven hundred and twenty 5-milligram oxycodone tablets per month with instructions to take six pills every four to six hours, ninety 30-milligram instant release morphine tablets to take one to two pills in the morning and at night, ninety 60-milligram extended release morphine tablets to take one at night, sixty 4-milligram Dilaudid, and injections of Demoral four times per week.

As if that were not enough, Wisner gave D.M. additional drugs "off the books." Wisner gave D.M. Wisner's personal oxycodone prescription, 50 morphine injectables, and 16 vials of liquid diazepam and needles.

D.M. testified that he was incapacitated and did not have the cognitive ability to make any decisions because of the number of drugs he was taking daily. His quality of work dropped, and he eventually lost his job. Although he drove to meet Wisner, he did so while in a "fog," a fog that lifted after he stopped taking the drugs. Directly related to

14

the drug use, he eventually became confined to a wheelchair. Every time he stood up, he would fall. This resulted in 40 falls with 20 confirmed concussions and selective traumatic brain injuries.

Moreover, we cannot discount Wisner's own admissions during the interview shown to the jury. Wisner admitted in interviews with law enforcement that D.M. would have been impaired if he was using the drugs prescribed and Wisner admitted he took advantage of that impairment. He admitted that D.M. "couldn't know any better because he was so medicated." In addition, Wisner admitted in a consent order that he signed for the Kansas Board of Healing Arts surrendering his license that he sexually assaulted his patients and had inappropriate sexual contact with them. He essentially admitted the allegations in the criminal charges.

As previously noted, juries are comprised of persons of common intelligence. *Juarez*, 19 Kan. App. 2d at 40. Certainly Wisner presented some testimony supporting a finding that D.M. knew what was happening and was a willing participant and drug seeker, but viewing the evidence in the light most favorable to the State, we are convinced that a rational fact-finder could have found the defendant guilty beyond a reasonable doubt of the aggravated sexual battery charge against D.M.

Affirmed.