IN THE COURT OF APPEALS OF THE STATE OF KANSAS

No. 111,332

STATE OF KANSAS,
*Appellee*,

v.

BERNARD ORVILLE WALLIN,
*Appellant*.

SYLLABUS BY THE COURT

1.

When the sufficiency of evidence is challenged in a criminal case, appellate courts review all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence.

2.

In order to establish a defendant's guilt for the crimes of rape (K.S.A. 2014 Supp. 21-5503[a][2]), aggravated criminal sodomy (K.S.A. 2014 Supp. 21-5504[b][3][C]), and aggravated sexual battery (K.S.A. 2014 Supp. 21-5505[b][3]) when the victim is incapable of giving consent because of mental deficiency or disease, the State must prove beyond a reasonable doubt that the victim was (1) incapable of giving consent because of mental deficiency or disease and (2) such condition was known by, or was reasonably apparent to, the defendant.

3.

The test for consent is whether the victim understands the nature and consequences of the proposed sexual act. An individual has the capacity to give consent

1

if he or she can comprehend the sexual nature of the proposed sexual act, can understand he or she has the right to refuse to participate in the sexual act, and possesses a rudimentary grasp of the possible results arising from participation in the sexual act.

4.

Depending on the facts of the case, in order to prove beyond a reasonable doubt the crimes of rape (K.S.A. 2014 Supp. 21-5503[a][2]), aggravated criminal sodomy (K.S.A. 2014 Supp. 21-5504[b][3][C]), and aggravated sexual battery (K.S.A. 2014 Supp. 21-5505[b][3]), the victim's incapacity to give consent because of mental deficiency or disease may be established without expert testimony.

5.

Under the facts of this case, the evidence was sufficient, without expert testimony, to convince a rational factfinder that the victim did not have the capacity to give consent due to a mental deficiency or disease. In addition to having the opportunity to consider testimony from the defendant and the victim's guardian/conservator, the jury was able to listen to the victim's testimony, observe her demeanor in the courtroom, and assess her ability to comprehend the sexual nature of the acts, her right to refuse to participate in the sexual acts, and the possible results arising from participation in the sexual acts.

6.

Under the facts of this case, it was not error for the district court to provide to the jury, after closing arguments and prior to recessing for the night, a jury instruction similar to PIK Civ. 4th 101.12 that advises that a mistrial due to juror misconduct would result in tremendous expense and inconvenience to the parties, court, and taxpayers. The better practice, however, is to provide the instruction to the jury at the beginning of the trial.

Appeal from Ottawa District Court; JEROME P. HELLMER, judge. Opinion filed January 15, 2016. Affirmed.

*Adam D. Stolte*, of Kansas Appellate Defender Office, for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., BUSER, J., and WILLIAM R. MOTT, District Judge, assigned.

BUSER, J.:  Bernard Orville Wallin appeals his convictions for one count of rape, three counts of aggravated criminal sodomy, and two counts of aggravated sexual battery. The victim of these acts, M.J., is an adult with developmental disabilities. Wallin raises two issues on appeal. First, he contends the State presented insufficient evidence to establish his guilt. In particular, Wallin contends there was insufficient evidence to prove that M.J. was incapable of giving consent to the sexual acts due to a mental deficiency or disease because the State did not present any expert medical testimony. Second, Wallin asserts the district court erred when it provided the jury, after closing arguments and prior to the evening recess, an instruction on juror misconduct.

We conclude that, depending on the facts of the case, in order to prove beyond a reasonable doubt the crimes of rape (K.S.A. 2014 Supp. 21-5503[a][2]), aggravated criminal sodomy (K.S.A. 2014 Supp. 21-5504[b][3][C]), and aggravated sexual battery (K.S.A. 2014 Supp. 21-5505[b][3]), the victim's incapacity to give consent because of mental deficiency or disease may be established without expert testimony. After carefully reviewing the evidence in this case, which did not include expert testimony, we are persuaded the evidence was sufficient to convince a rational factfinder that M.J. did not have the capacity to give consent due to a mental deficiency or disease. We also find no error in the district court's instruction regarding juror misconduct.  Accordingly, the convictions are affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Wallin with various sex crimes against two adult women with developmental disabilities, *i.e.*, R.K. and M.J. The charges originated after R.K. approached a patrol officer for the Minneapolis Police Department in late 2011 and asked him to give a handwritten note to the chief of police, which contained sexual molestation allegations.

Subsequently, Officer Robert Matlack began investigating the case. Due to his knowledge of the limited mental capacity of R.K. and M.J., Officer Matlack spoke with Margaret Kilpatrick, M.J.'s guardian and conservator and R.K.'s adoptive mother. According to Officer Matlack, Kilpatrick informed him that M.J. and R.K. performed chores for Carolyn Allen, Kilpatrick's neighbor and Wallin's roommate, in the summer of 2011, but she terminated their employment when M.J. told her that she had seen Wallin touching R.K. and having her engage in oral sex. Additionally, M.J. said that Wallin had "touched her and had her work with her pants pulled down."

Officer Matlack interviewed R.K. and M.J. R.K. told Officer Matlack that she and M.J. had unwanted sexual contact with Wallin, and she did not report the abuse sooner because "[s]he was afraid she was going to get in trouble if she did." M.J., on the other hand, advised Officer Matlack that she saw Wallin unsuccessfully attempt to kiss R.K. on the lips once, and she relayed information she heard from R.K. about R.K.'s other encounters with Wallin. M.J. also claimed that Wallin had attempted to kiss her and asked her to engage in oral sex but she declined.

Officer Matlack then spoke with Wallin, and during two separate interviews, Wallin acknowledged that R.K. and M.J. had performed chores at Allen's residence but he insisted that other than the girls giving him "hugs that lasted too long," no sexual activity or fondling occurred. Later, however, Wallin participated in a recorded interview

4

with Agent Ricky S. Atteberry of the Kansas Bureau of Investigation (KBI). During this interview, Wallin admitted "to certain sexual acts" with R.K. and M.J. Following the interview, Wallin prepared a written statement:

> "The sexual contact [d]enials I gave to Matlack were inacuart [*sic*]. The contacts were to each of the girls, they were to their brests [*sic*] [and] to their vergina [*sic*]. Happened maybe four [and] five times. Don't recall any oral sex on [R.K.] she did on me. Never asked me to stop. Was injoying [*sic*] it too much. Maybe 4 or 5 times or even less. [M.J.] performed oral sex on me maybe 3 or 4 time[s]. No force was ever used [and] both were wanting to do these things, by opening their colthes [*sic*] [and] showing their privates to me."

After Wallin's interview with Agent Atteberry, Officer Matlack spoke with M.J. about her earlier statement. M.J. explained that the first time she spoke with him she was afraid that she and R.K. would "get in trouble" with the police if she reported what actually happened. According to Officer Matlack, M.J. "then told [him] that Mr. Wallin had touched her private spots. . . . She defined that as her breasts and vaginal areas. She talked about him performing oral sex on her, her performing oral sex on him, [and Wallin] digitally penetrating her vagina with his finger." M.J. further indicated that she did not want to have sexual contact with Wallin.

At the conclusion of the trial, the jury acquitted Wallin of all charges related to R.K. but convicted him of one count of rape, three counts of aggravated criminal sodomy, and two counts of aggravated sexual battery against M.J., a victim the jury deemed incapable of giving consent due to a mental deficiency or disease. On November 12, 2013, the district court sentenced Wallin to a controlling term of 155 months' imprisonment followed by 36 months' postrelease supervision.

Wallin filed this timely appeal.

SUFFICIENCY OF THE EVIDENCE

Wallin contends the State presented insufficient evidence to support his convictions because the State failed to prove, beyond a reasonable doubt, that M.J. was incapable of giving consent due to a mental deficiency or disease. When the sufficiency of evidence is challenged in a criminal case, we review the claim by looking at the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014).

The jury convicted Wallin of one count of rape, a severity level 1 person felony in violation of K.S.A. 2014 Supp. 21-5503(a)(2); three counts of aggravated criminal sodomy, severity level 1 person felonies in violation of K.S.A. 2014 Supp. 21-5504(b)(3)(C); and two counts of aggravated sexual battery, severity level 5 person felonies in violation of K.S.A. 2014 Supp. 21-5505(b)(3). In order to establish Wallin's guilt for these crimes, the State was required to prove that M.J. was (1) "incapable of giving consent because of mental deficiency or disease" and (2) such "condition was known by" Wallin "or was reasonably apparent to" Wallin. See K.S.A. 2014 Supp. 21-5503(a)(2); K.S.A. 2014 Supp. 21-5504(b)(3)(C); K.S.A. 2014 Supp. 21-5505(b)(3).

The test for consent is whether the alleged victim understands the nature and consequences of the proposed sexual act. See *State v. Greene*, 299 Kan. 1087, 1098, 329 P.3d 450 (2014); *State v. Ice*, 27 Kan. App. 2d 1, 4, 997 P.2d 737 (2000); *State v. Juarez*, 19 Kan. App. 2d 37, 40, 861 P.2d 1382 (1993), *rev. denied* 254 Kan. 1009 (1994). As explained by our court:

"Therefore, in order to preserve the constitutionality of the provision, the definition of 'nature and consequences' must be sufficiently clear to permit the person proposing sex, and the jury, to discern whether the individual can give legal consent. If an individual can comprehend the sexual nature of the proposed act, can understand he or she has the right to refuse to participate, and possesses a rudimentary grasp of the possible results arising from participation in the act, he or she has the capacity to consent." *Ice*, 27 Kan. App. 2d at 4-5.

On appeal, Wallin acknowledges that when viewed in a light most favorable to the State, the evidence established through lay witness testimony that M.J. "(1) was 44 [years old], but developmentally 4-6 [years old], (2) could not read or write, (3) could not put together a sequence of events, (4) could not cook, (5) could not use a dryer, and (6) did not know how a baby is made." Wallin complains, however, that while these facts pointed to whether he knew about M.J.'s condition or whether M.J.'s "ability, or inability, to consent was reasonably apparent," they do not address whether M.J.'s "condition actually rendered her *medically incapable* of engaging in consensual sexual intercourse." (Emphasis added.) According to Wallin, adults with developmental disabilities have varying intellectual abilities and limitations, so the State was required to introduce expert medical testimony to prove "M.J. could not, in an actual *medical capacity*, process the necessary mental thought pattern to form consent to sexual activity." (Emphasis added.)

The State did not introduce any expert testimony or admit medical records concerning M.J.'s mental capacity; instead, the State primarily relied upon the testimony provided by Kilpatrick, M.J., and the defendant to establish her inability to consent. But as the State asserts, while expert testimony could be helpful to a jury in cases such as this, Wallin has advanced no persuasive legal authority which supports his contention that the State *must* introduce expert medical testimony in order to obtain a lawful conviction for the charged crimes.

7

Expert testimony is generally admissible if it aids the jury with unfamiliar subjects or the interpretation of technical facts or if it assists the jury in arriving at a reasonable factual conclusion from the evidence. See *State v. Gaona*, 293 Kan. 930, 948, 270 P.3d 1165 (2012). Expert testimony, however, is unnecessary if the normal experience and qualifications of jurors allows them to draw proper conclusions from the provided facts and circumstances. See *State v. Wells*, 289 Kan. 1219, 1236, 221 P.3d 561 (2009); see also K.S.A. 2014 Supp. 60-456 (generally governing the admissibility of lay and expert opinion testimony). In other words, "[t]o be admissible, expert testimony must be helpful to the jury. Where it is not helpful, that is, where the normal experience and qualifications of laypersons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert testimony is inadmissible. [Citation omitted.]" *State v. Papen*, 274 Kan. 149, 157, 50 P.3d 37, *cert. denied* 537 U.S. 1058 (2002).

Wallin argues that in analogous situations Kansas courts have held that the State must introduce expert testimony to prove elements of other offenses. In support, he cites *State v. McAdam*, 31 Kan. App. 2d 436, 66 P.3d 252 (2003), *aff'd in part, rev'd in part* 277 Kan. 136, 83 P.3d 161 (2004), and *State v. Laturner*, 289 Kan. 727, 218 P.3d 23 (2009). Neither of these cases advance Wallin's legal contention.

Wallin maintains that *Laturner* demonstrates that "[i]n a prosecution for methamphetamines, the State must produce expert testimony at trial regarding results of lab tests." *Laturner* clearly is not applicable, however, because it addressed whether K.S.A. 22-3437, which permits the use of a forensic laboratory analyst's certificate of analysis in lieu of testimony, violated a defendant's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. After discussing the issue at length, our Supreme Court answered this question in the affirmative. 289 Kan. at 731-53.

Likewise, in *McAdam*, the defendant argued that the State presented insufficient evidence to sustain his convictions for attempted possession of anhydrous ammonia and

conspiracy to possess anhydrous ammonia. Both of these crimes required the State to prove "'the defendant knowingly possessed with the intent to use anhydrous ammonia for the illegal production of a controlled substance *in a container not approved for that chemical by the Kansas Department of Agriculture*.'" 31 Kan. App. 2d at 443. The State failed to present such evidence, and our court reversed McAdam's convictions. Our court did not, however, hold that expert testimony is the only means by which the State could have proven this element of the offense. 31 Kan. App. 2d at 443.

Wallin also cites a case, *Juarez*, that is factually more similar to this case. According to Wallin, *Juarez* provides that expert medical testimony is required to prove the victim's incapacity to consent. In *Juarez*, 19 Kan. App. 2d at 39, the defendant argued that in order to obtain a conviction for aggravated criminal sodomy based upon the victim's incapacity to consent due to a mental deficiency or disease, "the State must prove not only that the victim is mentally deficient but also that the mental deficiency renders the victim incapable of giving consent." After analyzing the issue, our court stated:

> "*Keim* [*v. State*, 13 Kan. App. 2d 604, 777 P.2d 278 (1989)] held that a person of common intelligence is capable of determining whether an individual's mental deficiency renders him or her incapable of giving consent. A juror, by definition, is a person of common intelligence. Therefore, when the capacity of a mentally deficient individual to consent to a sexual act is at issue, the jury is capable of determining whether that individual is able to understand the nature and consequences of engaging in such an act. In reaching its determination, the jury should evaluate the individual's behavior in normal social intercourse *as well as consider any expert testimony* concerning the individual's mental deficiency." (Emphasis added.) 19 Kan. App. 2d at 40.

Our court rejected *Juarez*' insufficiency of the evidence argument because "[t]he testimony of [the victim's] psychologist and his mother, as well as the demeanor of [the victim], were more than sufficient to support" a finding that the victim was incapable of consent. 19 Kan. App. 2d at 41.

9

Wallin reads *Juarez* as standing for the proposition that a "jury may determine an alleged victim's mental capacity when an expert testifies to that specific victim's actual abilities." But the State aptly points out that the *Juarez* panel never actually articulated such a requirement; indeed, "the [panel]'s choice of language—'consider *any* expert testimony'—plainly suggests there may or may not be expert testimony to consider." (Emphasis added.) As the State explains, "[i]f the [panel] contemplated that expert testimony was required and would always be present, then it would have used a more definite article and said the jury should evaluate the individual's behavior 'as well as consider *the* expert testimony.'" Wallin has misread our court's opinion in *Juarez*.

Medical, psychiatric, or psychological testimony may provide valuable expert evidence tending to prove—or disprove—the victim's incapacity to consent to sexual acts. We have never found, however, that such expert testimony is necessarily *required* in order to prove the victim was incapable of consent. Depending on the facts of the case, in order to prove beyond a reasonable doubt the crimes of rape (K.S.A. 2014 Supp. 21-5503[a][2]), aggravated criminal sodomy (K.S.A. 2014 Supp. 21-5504[b][3][C]), and aggravated sexual battery (K.S.A. 2014 Supp. 21-5505[b][3]), the victim's incapacity to give consent because of mental deficiency or disease may be established without expert testimony.

Turning to the unique facts of this case, we find the evidence was clearly sufficient, without expert testimony, to convince a rational factfinder that M.J. did not have the capacity to consent.

Kilpatrick, who has served as M.J.'s guardian and conservator for 15 years and operated a foster home for "children that [were] developmentally . . . normal and also children that were developmentally challenged," testified about M.J.'s mental capabilities, the extent of her disabilities, and her understanding of the nature and consequences of sexual acts. Although M.J. was 44 years old at the time of Wallin's trial, Kilpatrick

10

estimated that she has a mental capacity equivalent to that of a 4- to 6-year-old child who requires constant supervision. M.J. cannot read, and, with the exception of copying down letters, she cannot write. According to Kilpatrick, M.J. has the ability to perform activities of daily living, but she cannot use a stove as "she does not have the concept of how not to burn herself or set a fire," and she cannot drive a car "[b]ecause she is not capable of making the decisions that are necessary to drive." Kilpatrick further explained that while M.J. can remember past occurrences, it is "impossible" for her to sequence events and she does not really have any concept of time.

According to Kilpatrick, in November or December 2011, M.J. told her, in "very simple[,] basic words," that she was upset because Wallin had been sexually molesting R.K., and then, after 10 to 15 minutes, M.J. stated that Wallin had also been "touching her sexually and had been making sexual innuendoes to her." According to Kilpatrick, M.J. does not understand how a baby comes into the world; M.J. simply knows the baby is "in the mother's tummy and she knows it comes out." Kilpatrick explained that she told M.J. not to have sex, as "[w]e're going to do a lot of working and living and enjoying and having a good time in our life and we do not need that." Although Kilpatrick believed M.J. understood, she indicated that M.J. is "always a victim" because she will follow any instruction an adult gives her: "She is the person that if any man or whatever just said lie down she would do what she was told."

The jury also had the opportunity to observe M.J.'s intellect and demeanor and fully assess her ability to understand the nature and consequences of the sexual acts and comprehend the fact that she had the right to refuse to participate. See *Greene*, 299 Kan. at 1098 ("[I]t is significant that A.F. testified for almost 2 hours, permitting the jury to fully assess A.F.'s responses and demeanor and determine based on all the evidence whether A.F. comprehended the sexual nature of the acts she engaged in with Greene, understood she had a right to refuse, and possessed a rudimentary grasp of the consequences.") Our review of M.J.'s testimony reveals that she had difficulty

11

understanding abstract concepts, occasionally had difficulty comprehending questions, and frequently gave confusing or inappropriate answers to questions.

M.J. testified that during the time she performed chores at Allen's residence, she "did not like how [Wallin] touched [her] and in [her] private spots touched [her] butt and [her] breasts and he kissed [her] on the mouth." According to M.J., Wallin touched her breasts with his mouth, her buttocks with his hands, and he told her to engage in oral sex. M.J. explained that Wallin placed his fingers inside her vagina on more than one occasion which terrified her and made her angry. M.J. further testified that Wallin touched her vagina with his mouth:  "He licked me in my private spots, I know he did. . . . I told him he was really rude." Twice, M.J. made a statement—in an apparent reference to the frequency with which the sexual acts occurred—to the effect of:  "He did it 70 times and 16 times with me and [R.K.] and that's the truth." Moreover, while M.J. demonstrated the ability to identify male and female anatomy using common terminology, her responses to questions on the topic of consent showed that she did not have a rudimentary understanding of her right to refuse unwanted sexual contact.

Finally, Wallin's testimony also supports the jury's finding that M.J. was incapable of providing consent. While Wallin openly admitted that he engaged in various sex acts with R.K. and M.J., he maintained the acts were consensual. According to Wallin, his sexual relationship with R.K. and M.J. began because "they talked about sex a lot." Regarding M.J., Wallin testified that she told him she had a baby "probably 20 years" ago and she was currently involved in a sexual relationship with a man named Mike Smith. Wallin, however, doubted the veracity of this story:  "Well I knew that none of that was true in my mind, yet she wanted me to think that it was and that there was a sexual relationship there." But Wallin believed that M.J. properly consented to him touching her because "it had been done before with . . . someone else in the past and she had a baby and she talked about it." Nevertheless, Wallin could not recall the events that precipitated the sexual activity:  "As far as [M.J.] goes, I don't recall how it happened, how it started. I

don't really know. There was no—no pushing away or saying no or screaming or nothing. It just was allowed."

Significantly, the following direct and cross-examination tended to show that Wallin knew M.J. was incapable of providing consent due to her mental deficiencies:

"[DEFENSE COUNSEL:]  Okay. And would you describe [R.K.] for example as lower developed?

. . . .

"[WALLIN:]  Lower than a 26 year old or 28 year old, yes, but she wasn't a five year old by any means.

"[DEFENSE COUNSEL:]  And with [M.J.]?

"[WALLIN:]  *To compare the girls [M.J.] would be closer to the five or six year old, seven, somewhere in there.*

"[DEFENSE COUNSEL:]  Again that's how you describe it. Is that how you feel about her, that she's a seven year old girl?

"[WALLIN:]  No.

. . . .

"[DEFENSE COUNSEL:]  *Is she smart, [M.J.]?*

"[WALLIN:]  *No. No, she's not.*

"[DEFENSE COUNSEL:]  *Is she normal?*

"[WALLIN:]  *No, I wouldn't say she's normal.*

"[DEFENSE COUNSEL:]  Is she below normal?

"[WALLIN:] Depending on what you call normal or what.

"[DEFENSE COUNSEL:]  What do you call normal? . . .

"[WALLIN:]  *Well normal would be well a high school kid, you know, that just got out of school.*

. . . .

"[PROSECUTOR:]  . . . [T]his morning you watched the video, *do you recall Mr. Atteberry asking you—he asked you about whether the girls understood sex and do you recall saying [R.K.] does; do you remember that?*

"[WALLIN:] *Yes, I would say I said that.*

"[PROSECUTOR:] *And then do you recall saying but [M.J.] does not—but [M.J.] does not?*

"[WALLIN:] *That is a false statement. I think she does.*

"[PROSECUTOR:] *But on the video you said she didn't; do you recall that?*

"[WALLIN:] *I may have said that on the video, but I don't have to believe it. It's because I said it and I said some things on that video that I think they wanted to hear.*" (Emphasis added.)

The jury found the evidence sufficiently established Wallin's guilt as to M.J. The jury, however, acquitted Wallin of similar charges relating to R.K. The verdicts demonstrate that the jury utilized its assessment of the responses and demeanor of R.K. and M.J. to determine, based upon the evidence, their respective abilities to consent. On appeal, we do not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility. *Williams*, 299 Kan. at 525. Such decisions are solely within the province of the trier of fact, and we will not overturn a jury's verdict simply because the evidence failed to exclude every other reasonable conclusion or inference. See *State v. Scaife*, 286 Kan. 614, 618, 186 P.3d 755 (2008).

In summary, when viewed in the light most favorable to the prosecution, there is substantial competent evidence upon which a rational factfinder could have found Wallin guilty of committing the six sex crimes against M.J., a victim incapable of providing consent due to a mental deficiency or disease.

PROPRIETY OF THE INSTRUCTION ON JUROR MISCONDUCT

For his second issue on appeal, Wallin contends the district court deprived him of a fair trial when, after closing arguments and prior to the evening recess, the district judge provided the jury with an instruction against juror misconduct similar to PIK Civ. 4th 101.12. This preliminary instruction for jurors in civil cases advised the jury to avoid

14

outside information about the case because a new trial would be an expense and inconvenience to both parties.

At trial, because closing arguments concluded at 5:10 p.m., the jury decided to delay the commencement of its deliberations until the morning. Prior to excusing the jury for the evening, the district judge admonished the jurors about their responsibilities. After describing, at length, the rules and restrictions regarding outside exposure to information related to Wallin's case, the district judge stated:

> "You must not engage [in] any activity or be exposed to any information that might unfairly affect the outcome of this case. Any juror who violates these restrictions I have explained to you jeopardizes these proceedings and a mistrial could result that would require the entire trial process to start over. *As you can imagine a mistrial is a tremendous expense on each of the parties, the court and the taxpayers*." (Emphasis added.)

Our standard of review for addressing challenges to jury instructions is based upon the following analysis:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

15

With regard to the preservation inquiry, Wallin candidly concedes that he did not object to the instruction. This failure to object is consequential. A party may not claim error for the district court's giving or failure to give a jury instruction unless (1) the party objects before the jury retires, stating distinctly the matter to which the party objects and the grounds for the objection; or (2) the instruction or the failure to give the instruction is clearly erroneous. *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013). Accordingly, because Wallin failed to object to the instruction, he must establish clear error. See *State v. Bolze-Sann*, 302 Kan. 198, 209-10, 352 P.3d 511 (2015).

Appellate courts utilize a two-step process in determining whether a challenged instruction was clearly erroneous:  (1) the court must determine whether there was any error at all by considering whether the subject instruction was both legally and factually appropriate, employing an unlimited review of the entire record; (2) if the court finds error, it must assess whether it is firmly convinced the jury would have reached a different verdict without the error. See *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484, *cert. denied* 135 S. Ct. 728 (2014). In evaluating whether an instruction rises to the level of clear error, the issue of "[r]eversibility is subject to unlimited review and is based on the entire record," and the party claiming error in the instructions has the burden to prove the degree of prejudice necessary for reversal. *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

Citing *State v. Salts*, 288 Kan. 263, 200 P.3d 464 (2009), Wallin argues that the district judge committed reversible error because he provided the jury with an *Allen*-type instruction, *i.e.*, he informed the jury that a "mistrial is a tremendous expense on each of the parties, the court and the taxpayers." See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). "[A]n *Allen* instruction is any instruction 'that encourages the jury to reach a unanimous verdict so as to avoid a mistrial.' [Citations omitted.]" *State v. Tahah*, 302 Kan. 783, ___, 358 P.3d 819, 826 (2015). In *Salts*, our Supreme Court

16

disapproved of the inclusion of the phrase "'[a]nother trial would be a burden on both sides'" in an *Allen*-type instruction:

> "Contrary to this language, a second trial may be burdensome to some but not all on either side of a criminal case. Moreover, the language is confusing. It sends conflicting signals when read alongside . . . [an] instruction that tells jurors not to concern themselves with what happens after they arrive at a verdict." *Salts*, 288 Kan. at 266.

Recently, however, a majority of our Supreme Court declined to expand the holding of *Salts* to preliminary jury instructions. *Tahah*, 302 Kan. at ___, 358 P.3d at 826-27. In *Tahah*, the district court informed the newly impaneled jury at the beginning of trial that the "consideration of outside information could result in a mistrial, which 'is a tremendous expense and inconvenience to the parties, the Court and the tax payers.'" 302 Kan. at ___, 358 P.3d at 825. After noting the court's "long and justified history of disapproving *Allen*-type jury instructions," the majority concluded that the "warning against juror misconduct contained in PIK Civ. 4th 101.12 is both legally and factually accurate in the criminal context as well as the civil." 302 Kan. at ___, 358 P.3d at 827. The court explained:

> "The preliminary jury instruction here . . . is not an *Allen* instruction. Its character and purpose are entirely different. The instruction occurred at the start of trial, before the presentation of evidence, and warned jurors of the dangers of a mistrial resulting from their own misconduct. As such, its coercive effect (to prevent juror misconduct) is entirely proper and justified. Moreover, because its purpose is proper, the instruction is factually accurate. The prospect of a mistrial due to juror misconduct—especially when viewed from the pretrial vantage point of the parties—is, in fact, equally inconvenient and undesirable to both parties. In particular, it interferes with the defendant's right to a speedy resolution of the criminal allegations against him or her. Given this significant distinction, the *Salts* rationale is inapplicable here.
> "Juror misconduct imposes grave costs not only to the parties and others involved in the trial process, but significantly to the integrity of our jury trial criminal justice

17

system itself, which depends on the honest and ethical behavior of jurors. We do not need to look far to see the ease with which today's smartphone equipped jurors can commit misconduct—perhaps even innocently. [Citation omitted.]" *Tahah*, 302 Kan. at ___, 358 P.3d at 827.

Based on *Tahah*, we find no error occurred here because the district judge's admonishing remarks were not legally or factually inaccurate.

It is important to note, however, there is one difference between the facts in *Tahah* and this case; the instruction in *Tahah* was given before the presentation of evidence whereas the instruction provided here was given after closing arguments and prior to the jury's deliberation. See *Tahah*, 302 Kan. at ___, 358 P.3d at 826-27. As explained by our court in *State v. Davis*, No. 112,204, 2015 WL 6443466, at *3 (Kan. App. 2015) (unpublished opinion):

> "We note this difference because the court in *Tahah* suggested that the 'coercive effect' of the instruction was proper in part because of the timing of the instruction—that is, the jury should be cautioned about misconduct in light of the opportunity for such misconduct to occur during the trial. [*Tahah*, 302 Kan. at ___, 358 P.3d at 826-27.]"

The instruction at issue in *Davis* presented a similar timing issue because it was provided to the jury at the close of the evidence but before the parties' closing arguments. Nevertheless, our court determined that although the "better practice" would be to give such an instruction at the beginning of the trial, it is not erroneous for a district court to give the instruction prior to jury deliberation because "as the majority observed in *Tahah*, there is both the opportunity for and danger of juror misconduct during the deliberation phase of the trial." 2015 WL 6443466, at *3.

We find *Davis* persuasive. Accordingly, we conclude the district court did not err when it utilized a juror misconduct instruction similar to PIK Civ. 4th 101.12. We

18

reiterate, however, the *Davis* court's admonition that, if the instruction is given, the better practice is to provide it to the jury at the beginning of trial.

Moreover, assuming the timing of the admonishment was erroneous, this error does not warrant reversal because Wallin has failed to show that it impacted the outcome of his trial. See *State v. Horton*, 300 Kan. 477, 493, 331 P.3d 752 (2014) (in the absence of evidence of deadlock and in the presence of compelling evidence of guilt, no clearly reversible error in giving *Allen*-type instruction); *State v. King*, 297 Kan. 955, 985-86, 305 P.3d 641 (2013) (same).

Wallin insists that reversal is warranted because the district judge's admonishment may have coerced a minority juror to convict him, as "[t]his case amounted to a credibility contest between [Kilpatrick] and [himself]." We doubt the admonishment had any coercive effect. The record is devoid of any evidence which suggests the jury was unduly influenced by the district judge's admonishment. In fact, the jury deliberated 4 to 6 hours, and during this time, the jurors never communicated that they were deadlocked, at an impasse, or in any way pressured into reaching a verdict. Additionally, the evidence supporting Wallin's convictions was substantial, and the jury's decision to acquit on the charges related to R.K. demonstrates the jury "remained quite capable of holding the State to its burden of proof at trial, despite the language in the preliminary instruction." See *Davis*, 2015 WL 6443466, at *4.

In conclusion, the district court did not err when it provided the jury with an instruction similar to PIK Civ. 4th 101.12.

Affirmed.

19

* * *

WILLIAM R. MOTT, District Judge, assigned, concurring: I join in the majority opinion as to all issues decided in this matter. With regard to the propriety of the instruction on juror misconduct, I agree with the majority's analysis and application of *State v. Tahah,* 302 Kan. 783, ___, 358 P.3d 819, 826 (2015), to the facts of this case.

I write separately only to express my view that the admonishment given to the jury prior to their being excused for the evening was accurate and proper, regardless of timing. When a juror gains or seeks outside information about the trial he or she does jeopardize the proceedings. A mistrial could result. If that happened the whole process of trial would start over—both parties would be placed back to the procedural position they occupied before the jury was summonsed. In the ordinary course, a mistrial based upon juror misconduct is costly all around. The timing of the instruction does not change the truth of the matter. Moreover, the timing of the instruction does not alter the instruction's clear and proper coercive purpose. Any juror gets it—do not seek outside information about the case, etc.

The Kansas Supreme Court's jurisprudence regarding *Allen* instructions, and its focus on the factual inaccuracy of *Allen* instructions, has provided a platform from which to unnecessarily complicate the instruction given in this case and its decision in *Tahah*. Our jurisprudence has consistently found fault with *Allen* instructions for two basic reasons: 1) The risk of exerting undue pressure on jurors for a verdict, and 2) factual inaccuracy. See *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009). The first reason, on its own, should justify the prohibition of *Allen* instructions.

The factual inaccuracy rationale clouds the issue. I concede that from the posttrial vantage in time, it is factually unlikely that the losing party would view a mistrial as an inconvenience. I would further concede that a trial court, operating in the present when giving an *Allen* instruction, can predict in any given case that the party that will

20

eventually receive a favorable verdict would naturally view a mistrial as an inconvenience while the party that will eventually receive an unfavorable verdict would regard a mistrial with glee. So what? It is the *Allen* instruction's illegitimate effect on the process that is the issue, not the failure of the instruction to square factually with the predictable views of the parties after a verdict is reached. Consider the following attempt at creating a more accurate *Allen* instruction: *Another trial would be a tremendous inconvenience on the party destined to prevail.* Arguably, this instruction is more accurate than the *Allen* instructions the court has considered in the past, yet it is arguably even more coercive to holdout jurors. The crux of the matter is always the purpose of the instruction and the likely effect on the jurors.

The *Tahah* court did not take this tact. In distinguishing an instruction like the one given in this case, the *Tahah* court stated that the instruction's "coercive effect (to prevent juror misconduct) is entirely proper and justified" and that "because its purpose is proper, the instruction is factually accurate." *Tahah*, 302 Kan. at ___, 358 P.3d at 827. If a proper purpose can make facts accurate, an improper purpose can make facts inaccurate, right? Indeed, the *Tahah* court agrees, holding that the improper purpose of coercing a unanimous verdict causes the *Allen* instruction to be an instruction that "has rightly been described as factually inaccurate." 302 Kan. at ___, 358 P.3d at 827. This sleight of hand is unnecessary because the court should hold that it is the *Allen* instruction's illegitimate effect on the process that is the issue, not the failure of the instruction to square factually with the predictable views of the parties after a verdict is reached.

Shedding the yoke of confusing and superfluous rationale from the court's *Allen* instruction jurisprudence, the analysis of the instruction in this case is simple. The instruction given in this case simply suggests jurors think of the consequences of engaging in juror misconduct prior to engaging in it. This instruction meets jurors where they will be shortly, alone with that iPhone and no one will probably ever know. The court and the parties should be concerned. What could be more devastating to a defendant

21

than a juror's Internet search uncovering a defendant's lengthy criminal history? These are the rational fears of real life trial attorneys everywhere and can be a good reason not to object to the court's instruction.

In short, the expense of a trial is a proper consideration for any juror when deciding whether to follow the court's admonitions not to look for outside information. This is a far cry from instructions that encourage jurors to consider the expense of another trial as a factor in whether they vote guilty or not guilty, which is clearly improper as detailed in the majority opinion. In my estimation, no juror could reasonably conflate and distort the instructions given in this case to mean they should vote guilty to avoid a mistrial.