NOT DESIGNATED FOR PUBLICATION

No. 125,887

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

SHAWN PHILIP PEARL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Submitted without oral argument. Opinion filed September 20, 2024. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before PICKERING, P.J., MALONE and WARNER, JJ.

PICKERING, J.:  This is a direct appeal from Shawn Philip Pearl's bench trial. On appeal, he challenges the sufficiency of the evidence supporting his convictions for rape and aggravated criminal sodomy. Pearl argues the evidence was insufficient to support the district court's finding that the victim was incapable of consent due to mental deficiency or disease. After review, we find sufficient evidence supports his convictions, and we affirm.

1

In 2021, the State charged Pearl with rape and aggravated criminal sodomy of a 19-year-old victim, referred to here under the pseudonym Jane. See Supreme Court Rule 7.043 (2024 Kan. S. Ct. R. at 50). The State alleged that Pearl committed these crimes without Jane's consent while she was overcome by force or fear *or*, *alternatively*, while Jane was incapable of giving consent due to mental deficiency or disease.

Although the case was originally set for a jury trial, Pearl waived his right to a jury trial and requested a bench trial instead. The district court granted Pearl's request and held a bench trial on October 11, 2022. The same district court judge presided over both Pearl's preliminary hearing and trial.

*The bench trial*

Jane's grandmother (Grandmother) testified that Jane went to live with her in 2006 after Pearl was charged with sexually abusing Jane as a child, causing Jane to be placed in foster care. Jane was five years old when the sexual abuse occurred. Grandmother became Jane's legal guardian. In 2010, Pearl pleaded guilty to aggravated indecent liberties with a child under the age of 14 against Jane and was sentenced to 59 months' imprisonment. Grandmother is Jane's legal guardian and caretaker because Jane is mentally limited.

Grandmother recalled that it was difficult to raise Jane at first due to Jane having learning disabilities, developmental delays, severe anxiety, and attention deficit hyperactivity disorder. Jane added that she also suffers from post-traumatic stress disorder but does not know what it is from. Grandmother stated that things got easier once Jane was settled.

Grandmother testified that Jane graduated from high school and estimated that Jane functions at a 5th grade level in reading and an 8th grade level in math. Grandmother recalled that Jane took basic grammar and math classes, although Jane had an individual education plan (IEP), and her classes were separate from other students. Grandmother stated that Jane learned multiplication and division but not algebra. Jane was never required to write papers. Although Jane has graduated high school, she does not work or take any educational classes. Jane usually stays home while Grandmother goes to work, although she sometimes goes to an aunt's house.

Grandmother stated that Jane has a driver's license and can drive, although it is not safe for Jane to do so because of her anxiety. Additionally, Grandmother believed Jane could not comprehend complex issues or relationships, but that Jane had a good memory, was capable of following instructions, and could be opinionated.

Both Jane and Grandmother testified about Jane's understanding of sex. Grandmother talked to Jane "about inappropriate behaviors, like sex and stuff" when she was in high school and testified that Jane is aware of what sex is. According to Grandmother, Jane knows that sex can create babies, but Grandmother did not know "if she fully understands it." Jane testified that she knew what sex was "[b]ecause my grandma had that talk with me." But when Jane was asked if she could explain sex in her own words, Jane responded, "No."

Grandmother recalled that Jane had a sexual encounter with a girl while staying at a Respite House in the 10th grade. When asked about this at trial, Jane stated, "This girl touched me or we were trying to like explore each other, I guess." When Jane was asked if she wanted to do that, she responded, "Yes." Grandmother also stated that she had to have a talk with Jane after Jane sent inappropriate photos to a boy she met at group in Pawnee Mental Health (Pawnee). Jane had been going to Pawnee since she was five or six years old.

Grandmother testified that at some point while Jane was living with her, Jane expressed interest in wanting to have a relationship with Pearl. Grandmother had talked to Jane about why Pearl was previously incarcerated, but Jane still wanted to see him. When Jane was asked why she did not see Pearl growing up, she stated, "There was a court thing saying that I cannot be in contact with him until I turned 18." Jane explained that this was because "[h]e touched me inappropriately." Grandmother did not allow Jane to see Pearl until she was 19 years old.

The first time Jane saw Pearl after his 2010 imprisonment was at her high school graduation, which she invited Pearl to attend. Jane then started communicating with Pearl through text and decided she wanted to spend more time with him. Jane asked Grandmother if she could travel to Maine with Pearl and his new wife, Denese Pearl, during Christmas of 2018 to visit Pearl's family. Grandmother allowed Jane to go on this trip after Jane repeatedly insisted that it happen.

Jane testified that during the trip to Maine, Pearl asked her and her sister to touch Pearl "in his private part." Jane stated that "[w]e were all laying together and then he decided to ask [my sister] to touch him and then she said, No, and then he asked me and then I said, No." When Jane was asked why she told Pearl no, she responded, "Because I didn't want to do it." According to Jane, no inappropriate contact occurred.

Jane continued to talk to Pearl after the Maine trip and wanted to be close with him. The next time Jane saw Pearl was around Thanksgiving in 2019. Jane spent Thursday, November 28, through Sunday, December 1, with Pearl and Denese at Pearl's apartment in Leavenworth. The incident giving rise to Pearl's current convictions occurred during this visit.

Denese left the apartment for a while the Friday after Thanksgiving. Jane testified that while she and Pearl were alone, Pearl told Jane to shower. Jane got in the shower,

and Pearl got in with her and put soap on Jane's body. According to Jane, Pearl did not touch her inappropriately. After about 15 minutes, Jane and Pearl exited the shower. Jane then "put my towel on and then I go and lay on his bed and he puts lotion on my back and my bottom." Before doing this, Pearl told Jane that he was going to put lotion on her, and Jane said, "Okay." Jane then testified that Pearl put a "sex toy" in her anus "[u]ntil I said Ow more than once." Pearl then said he was sorry and stopped. Jane testified that she had never seen or felt a sex toy before, but "it felt like a sex toy . . . [because i]t feels hard."

After this occurred, Jane got dressed, and Pearl put his finger inside Jane's vagina under her clothes. As Jane put it, "It was after I got dressed already and I was laying back on the bed and I was watching TV and then that's when he touched my vagina." Pearl did not ask if he could do this. Sometime later, Denese returned to the apartment. Jane did not tell Denese about what happened.

Pearl and Denese drove Jane back to Grandmother's home on Sunday. Jane told Grandmother that she had a good time visiting Pearl. At trial, Jane stated that when she went home that weekend it was "really awkward for me because of what happened" and that "everything was off."

Jane told no one about the incident until much later when something happened during a group session at Pawnee that brought it up. Jane stated that group was for "people who go to Pawnee to express how they feel or to help them cope with certain things." When Jane was asked if she knew why she was in group, she responded, "No." After the session, Jane talked to someone who works with her at Pawnee and told her about the incident with Pearl over Thanksgiving. That person reported it to her boss and to Grandmother.

Grandmother testified that she first learned about what happened during Thanksgiving when a Pawnee worker came to talk with her in January 2020.

Grandmother stated that the worker told her that Jane had a breakdown at Pawnee and told several people about what Pearl had done to her over Thanksgiving. Grandmother reported the incident to law enforcement.

The district court also heard from Detective Heather Mowery. Mowery testified that she normally investigates juvenile cases and explained that although Jane was 19 years old, she worked on this case because of Jane's "mental delay." Mowery stated that Jane "may have been an adult but she still behaved as a child."

Mowery testified that as part of her investigation, she spoke with Jane's aunt, who explained that Jane has flashbacks about her previous sexual abuse from Pearl. Mowery also interviewed Pearl. Pearl denied ever being alone with Jane in his apartment and claimed that Denese was always there with them. Pearl stated that during the Thanksgiving visit, Jane asked to sleep in the bed with him and his wife and had to be told no by his wife. Pearl also explained that Denese had to tell Jane to bathe and "things of that nature." Mowery was also present during an interview with Jane and recalled that Jane mentioned Pearl used a sex toy on her. Mowery asked Pearl about sex toys, and Pearl stated that there were some in his apartment.

Mowery executed a search warrant at Pearl's apartment to locate the sex toys that Jane had mentioned. Mowery was wearing a body camera at the time. The body camera footage was admitted at trial and is included in the record on appeal. Mowery found two sex toys and lubricant in a closet in Pearl's apartment—photos of these items were admitted at trial. The sex toys were sent to KBI for testing and Jane's DNA was not found on them.

The district court also heard from Kelly Sneller, the program director at the Leavenworth Atchison Child Advocacy Center (CAC). Sneller testified that CAC does "forensic interviews for children and vulnerable adults who have had sexual abuse."

6

Sneller interviewed Jane on February 3, 2020, about the incident with Pearl. This interview was recorded, admitted at trial, and is included in the record on appeal. The interview took place in a child-friendly room that was neutral in color.

During the interview, Jane drew a sex toy on an easel. Jane told Sneller that she did not know what color the sex toy was because she did not see it. In closing argument, the State pointed out that Jane described the sex toy as a "hotdog thing" during this interview. Jane and Sneller played with Play Doh while Jane spoke.

Last, the district court heard from Denese. Denese testified that "I don't know where it came from, but [Jane] asked me [if she] could sleep in the bed between us." Denese found this to be "an odd question" and asked Jane why she would want to do this. Jane responded, "Because I want to be close to my father." Denese told Jane that was inappropriate and that Jane would "sleep on the sofa where you belong." Denese also recalled that she had to tell Jane to shower while Jane was staying at the apartment because Jane was "quite ripe." Denese stated that Jane "went into the bathroom, closed the door, [and] turned the water on." About "30 seconds" later, Jane came out "completely dressed and completely dry." So Denese sent Jane back into the bathroom and told her, "If you don't go take a shower I'm going to stand there and watch you take a shower." Jane went back into the bathroom to shower.

Denese also noted that Jane contacted her on Facebook after the proceedings in this case had started to ask why Denese and Pearl were not talking to her. Denese did not respond to Jane's message.

After hearing and considering all the evidence, the district court found that the State had not proven that Jane had been overcome by force or fear and dismissed those alternative counts. But the court found that the State proved that Jane was incapable of giving consent due to mental deficiency or disease.

In making its ruling, the district court stated:

> "Court has listened to testimony here today, has heard not only the testimony of the grandmother but has had the opportunity to observe the victim.
>
> "Court further would note that the Court did observe the victim at the preliminary hearing so Court has seen her testify twice.
>
> "Court is far from an expert on mental disease or defects; however, the grandmother testified that the young lady had the intellectual ability of approximately a 5th grader to 8th grader depending on what subject matter it was, and I would certainly agree with that. In listening to the young lady she clearly suffers from some disabilities and is not of average intelligence of an average person in our society."

The district court found Pearl guilty of the alternative counts of rape and aggravated sodomy.

*Posttrial proceedings*

Before Pearl was sentenced, he filed a motion for judgment of acquittal or a new trial, arguing that insufficient evidence supported the district court's finding that Jane lacked the ability to consent. In short, Pearl argued that the State failed to present evidence that Jane did not have a "rudimentary grasp" of the consequences of sex or that Jane's mental ability prevented her from understanding her right to refuse to participate in a proposed sexual act.

Pearl pointed out that Jane had finished high school, held a driver's license, discussed sex with Grandmother, and could be left alone without supervision. Pearl also argued that Jane understood consent because she testified about refusing an earlier sexual advance by Pearl in Maine and that she had sexual contact with a girl some years before. And Pearl noted that the State did not present any expert testimony or medical records about Jane's condition.

8

The State responded, arguing that it presented sufficient evidence of Jane's inability to consent. The State emphasized that Jane "did not understand that [Pearl] was victimizing her again and that she had the ability to leave." According to the State, this was because Jane still wanted to have a relationship with Pearl after Thanksgiving and because Jane told Grandmother she had a good time during the rest of the visit. And the State added that expert testimony was not required since the district court was able to observe Jane at the preliminary hearing, at trial, and in a prerecorded CAC interview.

The district court denied Pearl's motion for judgment of acquittal at sentencing, reaffirming its earlier ruling. The court pointed out that it was able to observe Jane twice—at the preliminary hearing and at the bench trial—and believed Jane's "mental deficiency was very apparent from listening to her and watching her."

The district court recalled testimony about Jane's grade level performance and being in special education classes. The court also described its belief that Jane did not fully appreciate that she had the ability to object to the sexual activity with Pearl. The court noted that Jane "did testify that she complained about it when it hurt, but she didn't otherwise object to it. And she just clearly did not understand what was going on, is the way the Court took it." The court also stated that expert testimony was not necessary here because "I thought the deficiency was so obvious from listening to her on the two occasions where I heard her testify."

The district court sentenced Pearl to 253 months' imprisonment for rape and a consecutive155 months' imprisonment for aggravated criminal sodomy, for a total controlling sentence of 408 months, with lifetime postrelease supervision.

Pearl now appeals.

ANALYSIS

*Sufficient evidence supports the district court's finding that Jane was incapable of consent due to mental deficiency or disease.*

Pearl challenges the sufficiency of the evidence supporting his rape and aggravated criminal sodomy convictions. He argues that Jane was not incapable of consenting to the sexual activity due to mental deficiency or disease.

*Standard of Review*

"When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Ward*, 292 Kan. 541, 581, 256 P.3d 801 (2011). This standard of review applies to convictions arising from both a bench trial and a jury trial. *State v. Frye*, 294 Kan. 364, 374, 277 P.3d 1091 (2012).

*Discussion*

At the bench trial, the State had to prove beyond a reasonable doubt for both charges that Jane was incapable of giving consent due to mental deficiency or disease. See K.S.A. 2019 Supp. 21-5503(a)(2) ("Rape is: . . . [k]nowingly engaging in sexual intercourse with a victim when the victim is incapable of giving consent because of mental deficiency or disease"); K.S.A. 2019 Supp. 21-5504(b)(3)(C) ("Aggravated criminal sodomy is: . . . sodomy with a victim who does not consent to the sodomy . . . when the victim is incapable of giving consent because of mental deficiency or disease"). As such, the district court was required to decide whether Jane was capable of giving valid consent in light of her developmental disabilities.

10

*The "nature and consequences" test*

In *State v. Ice*, 27 Kan. App. 2d 1, 4, 997 P.2d 737 (2000), a panel of this court outlined a test for consent—a "'nature and consequences'" test—for whether an individual was incapable of giving consent due to mental deficiency or disease as it relates to a sexual offense, such as rape. The *Ice* panel stated that an individual has the capacity to consent if he or she "can comprehend the sexual nature of the proposed act, can understand he or she has the right to refuse to participate, and possesses a rudimentary grasp of the possible results arising from participation in the act[.]" 27 Kan. App. 2d at 5.

A closer look at *Ice* illustrates how this "nature and consequences" test applies. There, Ice was convicted of rape after an incident with R.D.B., a 17-year-old girl who was "educable mentally handicapped" and had an IQ of 65. 27 Kan. App. 2d at 2. At trial, R.D.B. testified that Ice had "forced her to have sex with him" and that "she repeatedly told Ice to stop touching her privates during the alleged encounter . . . ." 27 Kan. App. 2d at 1. Ice appealed, arguing sufficiency of evidence because R.D.B. understood the nature and consequence of sex and, therefore, could consent to the sexual acts with him.

The district court heard evidence that R.D.B.'s condition stemmed from "her premature birth with very low birth weight, hydrocephalus, and a series of brain infections occurring over the first few months of her life." 27 Kan. App. 2d at 2. R.D.B. took sex education classes during school, knew about using protection during sex, understood that condoms protected you from AIDS, could state how sex works, which may result in pregnancy, and was aware that a person may decline sex by saying no.

The State also presented testimony from the psychiatrist who had examined R.D.B. and testified that R.D.B.'s mental age was "8 or 9 years old, with a commensurate ability to understand social situations and make judgments based upon her understanding." 27 Kan. App. 2d at 3. The psychiatrist also testified "that R.D.B.'s ability

11

to understand the consequences of sexual acts was impaired significantly." 27 Kan. App. 2d at 3.

The *Ice* panel acknowledged that the psychiatrist's testimony of R.D.B.'s "inability to understand consequences of specific acts 'impairs significantly' her ability to consent to sexual acts," but it found this was "simply too vague to support a finding beyond a reasonable doubt that she was incapable of consent." 27 Kan. App. 2d at 5. The test, the panel stressed, "is not whether the individual is impaired, but whether the individual is incapable of *knowingly* consenting." (Emphasis added.) 27 Kan. App. 2d at 5. R.D.B. testified that she understood she was being forced to have sex and repeatedly told Ice no. This testimony, the panel explained, "shows she understood what was going on quite well. It is difficult to see what else the 'nature and consequences' test would require." 27 Kan. App. 2d at 5. The panel found that no evidence showed R.D.B. lacked the capability to refuse or consent to sex.

Our courts have continually applied this consent test to determine whether a person understands the nature and consequences of the proposed sexual act. See *State v. Greene*, 299 Kan. 1087, 1098, 329 P.3d 450 (2014); *State v. Wallin*, 52 Kan. App. 2d 256, Syl. ¶ 3, 366 P.3d 651 (2016).

At the bench trial, the district court as the fact-finder evaluated Jane's behavior through its own observations and heard the testimonial evidence, including testimony concerning Jane's mental deficiency. From the trial evidence presented, the court found Jane's testimony "highly credible" and Jane was incapable of consent due to mental deficiency or disease. See *State v. Juarez*, 19 Kan. App. 2d 37, 40, 861 P.2d 1382 (1993).

12

Pearl argues that the State presented no direct evidence from which the district court could have found that Jane lacked the capacity to understand the nature and consequences of the sexual activity that occurred during Jane's Thanksgiving visit. Pearl asserts that Jane has a rudimentary understanding of the consequences of sex. He points out that Grandmother talked to Jane about sex before she graduated high school, and Grandmother stated Jane is aware that sex is where babies come from, although she was not sure if Jane fully understands it. Pearl also argues that evidence showed Jane was capable of consenting to sexual activity and refusing it. As an example of Jane's capacity to consent, Pearl notes that Jane testified that she willingly engaged in a sexual encounter with a girl while staying at a Respite House in the 10th grade. And as an example of Jane's understanding of her right to refuse sexual activity, Pearl points to Jane's refusal when he asked Jane and her sister to touch him inappropriately.

Pearl's assertion that Jane's testimony she understood the consequences of sex is not compelling. Jane could not describe sex in her own words. And when other panels of this court have found insufficient evidence that a person could not consent, the alleged victim displayed a much more sophisticated understanding of the consequences of sex than Jane. See *Ice*, 27 Kan. App. 2d at 5 (victim testified about taking sex education classes, using condoms to protect from AIDS, displayed knowledge of sex organs); *State v. Wylie*, No. 99,580, 2009 WL 1499159, at *5 (Kan. App. 2009) (unpublished opinion) (finding victim's "understanding of sex and its consequences is far from rudimentary").

While in Maine, Jane declined Pearl's request that she touch him inappropriately. This "no" response does not, however, automatically establish that she possessed the capacity to consent. See *State v. Chaney*, 269 Kan. 10, 17, 5 P.3d 492 (2000); *Wallin*, 52 Kan. App. 2d at 258; *Wylie*, 2009 WL 1499159, at *5. Jane only said "No" after her sister

13

turned down Pearl's request, suggesting that she may have just mirrored her sister's reaction without fully appreciating the situation.

As to Jane's mental ability, Pearl argues that Jane was not impaired because she had a 5th grade understanding of reading, an 8th grade understanding of math, was issued a driver's license, graduated from high school, and was usually left alone when Grandmother went to work. The State cites many of these same facts but draws opposite conclusions from them. For example, although Jane graduated from high school, she had an IEP and did not take the same classes as other students. The State adds that Jane cannot drive because of her anxiety, her cooking skills are limited to grilled cheese, and she has a court-appointed guardian. Notably, despite attending Pawnee for over a decade, Jane did now know why she was in a group receiving services through Pawnee. Again, "[t]he test is not whether the individual is impaired, but whether the individual is incapable of *knowingly* consenting." (Emphasis added.) *Ice*, 27 Kan. App. 2d at 5. The evidence here is sufficient to support a finding that Jane was incapable of knowingly consenting.

Pearl also highlights a statement that the district court made at sentencing when it denied his motion for a new trial. The court observed that Jane's testimony was "very matter of fact when testifying about having sex with [Pearl]. She did not seem to show any embarrassment . . . [or] any kind of indication that she could see it was not socially acceptable. She just seemed to talk about it like she was talking about the weather, like it was no big deal." Pearl suggests that "Jane's lack of shame or embarrassment about sex with [him] is just as likely from a lack of shame or embarrassment about sex with [him] than from a lack of understanding about the issue." Pearl acknowledges that from Jane's apparent lack of shame of committing a sexual act with Pearl, the court could have reasonably weighed this to mean that she did not have the ability to understand what took place with Pearl.

Significantly, the district court had the opportunity to observe Jane testify at the preliminary hearing and at the bench trial. The district court was able to fully assess Jane's demeanor, responses, and social interactions to determine whether she could comprehend the sexual nature of the acts with Pearl, understood that she had a right to refuse, and possessed a rudimentary grasp of the consequences of the sexual act. The district court also viewed a prerecorded CAC interview of Jane. In fact, the district court acknowledged Jane's "mannerisms and the way she said things" as one of the reasons it did "not believe that she fully appreciated that it was wrongful-type conduct by the defendant." The district court's advantages in this regard should be afforded appropriate weight. See *Greene*, 299 Kan. at 1098 (emphasizing significance of fact-finder assessing a person's ability to consent by observing her testimony at trial); *Wallin*, 52 Kan. App. 2d at 264-65 (same).

Pearl acknowledges that a fact-finder's observations of a victim are relevant but argues that they must "act as a support for other evidence of lack of capacity." And Pearl asserts that the district court found Jane incapable of consent based solely on its observations of her, without pointing to any other evidence or factors. Yet, as the State asserts, Pearl has presented no authority requiring the district court to make specific factual findings on the record explaining its decision and identifying certain evidence supporting it during the bench trial. Still, as this discussion details, the district court did not make its decision based *solely* on the fact that it observed Jane testify. In addition to Jane's testimony, the court also heard the testimony of Grandmother, Mowery, Denese, Sneller, and it viewed the exhibits admitted at trial.

A review of the record shows that Jane's responses to questions about relationships and consent indicate that she did not understand the sexual nature of the contact with Pearl, did not comprehend her right to refuse it, and did not have a rudimentary understanding of the consequences of participating in it. One example illustrating that Jane was unable to consent is her testimony about Pearl penetrating her with a sex toy. As

15

the district court put it, Jane "did testify that she complained about it when it hurt, but she didn't otherwise object to it. And she just clearly did not understand what was going on . . . . She did not appear to understand that she had the ability to not consent." Jane's response of saying "Ow" to what she thought was Pearl's use of a sex toy did not articulate any specific thoughts or reactions to sexual abuse. Jane's testimony reasonably showed she lacked an understanding of what was occurring and her ability to refuse it. Pearl did not ask permission to penetrate Jane with a sex toy, and Jane may not have understood her right to refuse to participate in the sexual activity on her own accord.

Other evidence of Jane's inability to comprehend the sexual nature of some acts is Jane's story about being in the shower with Pearl. Jane testified that she followed Pearl's instructions to shower, and then Pearl followed her into the shower. Here, Jane was simply following the directions of adults. Jane stated that Pearl "put soap on my body but didn't touch me." The State then asked Jane, "Okay, when you mean he didn't touch you, you mean he didn't touch you inappropriately?" Jane responded, "Yes." Jane's responses do suggest to a fact-finder that she lacks the ability to understand that showering with another adult—here, Pearl—is inherently sexual and socially unacceptable. Her testimony displays an extremely literal and limited understanding of intimacy. Grandmother also testified to this fact regarding Jane's limitations.

Another example that Jane did not comprehend relationships or the sexual nature of certain acts was Jane's odd request to sleep in the bed between Pearl and Denese while she was staying at Pearl's apartment. Denese noted this in her testimony, and Mowery stated that Pearl also mentioned it in his interview. When Denese asked Jane why she would want to do this, Jane responded it was because she wanted to be close to Pearl. Denese then had to tell Jane that was not appropriate and that Jane was to sleep on the sofa. Jane testified that she only asked to do this once and did not ask again after Denese talked to her. Jane, moreover, was aware that Pearl went to prison for sexually abusing her as a child.

The State asserts that Pearl's argument is merely a request to reweigh the evidence. The State is correct; Pearl's arguments amount to asking us to reweigh the evidence presented at his bench trial. "[W]e do not reweigh evidence . . . . Such decisions are solely within the province of the trier of fact, and we will not overturn a . . . verdict simply because the evidence failed to exclude every other reasonable conclusion or inference. [Citation omitted.]" *Wallin*, 52 Kan. App. 2d at 267.

We find sufficient evidence supports Pearl's convictions of rape and aggravated criminal sodomy against Jane while Jane was incapable of giving consent due to mental deficiency or disease.

Affirmed.